[No. 84475-5.   En Banc.]
Argued May 10, 2011.     Decided October 18, 2012.

*In the Matter of the Personal Restraint of* EDWARD MICHAEL
GLASMANN, *Petitioner.*

*Jeffrey E. Ellis* (of *Oregon Capital Resource Center*), for petitioner.

*Mark E. Lindquist*, *Prosecuting Attorney*, and *Thomas C. Roberts*, *Deputy*, for respondent.

¶1 MADSEN, C.J. — Edward M. Glasmann was convicted of second degree assault, attempted second degree robbery, first degree kidnapping, and obstruction arising from incidents that occurred while he was intoxicated. During closing argument, the prosecuting attorney made an electronic presentation to the jury that graphically displayed his personal opinion that Glasmann was "guilty, guilty, guilty" of the crimes charged by the State. The prosecutor's misconduct was flagrant and ill intentioned, and we cannot conclude with any confidence that it did not to have an effect on the outcome of the trial. We reverse the defendant's convictions and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶2 In celebration of his October 2004 birthday, Edward Glasmann and his fiancée, Angel Benson, rented a motel room in Lakewood, Washington. Over the course of the evening, the two ingested methamphetamine, ecstasy, and alcohol. Glasmann and Benson had been arguing throughout that day and evening and around midnight, their argument escalated. Glasmann started punching and kicking Benson. He told Benson he wanted to go for a ride and then dragged her out of the motel room. Outside the motel room, another motel guest witnessed Glasmann punch and kick Benson before dragging her to the passenger side of his Corvette. This witness called 911 and provided an account of the events.

¶3 From the driver's seat, Glasmann reached over to open the passenger door and attempted to pull Benson into

the car by her hair. Benson testified that she was partially in the car and stumbled when Glasmann ran the car up her leg, backed off of her leg, pulled her into the car, and drove out of the parking lot. Benson was then able to get the car into park. She next grabbed the car keys and ran into a minimart adjacent to the motel.

¶4 Inside the minimart, she hid on the floor behind the cashier's counter. Police soon arrived and attempted without success to apprehend Glasmann. Shouting at the officers to shoot him and claiming to possess a firearm, Glasmann ran into the convenience store. He ran behind the counter, held Benson in a choke hold, and threatened to kill her. As officers approached, Glasmann held Benson between himself and the officers. Benson was able to wiggle free enough to allow an officer to use a stun gun on Glasmann.

¶5 The officers subdued and arrested Glasmann. In the process, Glasmann was held down by one officer while another officer stomped on his head approximately five times. Glasmann continued to struggle as he was dragged out of the minimart. His booking photograph shows extensive facial bruising. The incident inside the minimart was recorded on the store's security camera.

¶6 The State charged Glasmann with first degree assault, attempted first degree robbery, first degree kidnapping, and obstruction. Exhibits admitted into evidence included the minimart security video, photographs of Benson's injuries, the 911 recording, recordings of telephone calls between Glasmann and Benson, and Glasmann's booking photo. The defense offered Glasmann's booking photo to display Glasmann's facial injuries sustained during arrest.

¶7 At trial, Glasmann did not deny culpability. Rather, he disputed the degree of the crimes charged. He argued the jury should convict only on lesser included offenses. The prosecution sought to establish that Glasmann acted with intent, a necessary element of all the crimes charged.

¶8 In closing argument, the State used an extensive PowerPoint[1] presentation that included numerous slides incorporating the security camera video, audio recordings, photographs of Benson's injuries, and Glasmann's booking photograph. Each of the slides containing a video shot or photograph included a caption consisting of testimony, recorded statements, or the prosecutor's commentary.[2]

¶9 One slide showed Glasmann crouched behind the minimart counter with a choke hold on Benson and a caption reading, "YOU JUST BROKE OUR LOVE." State's Resp. to Pers. Restraint Pet. (PRP), App. G at 1. Another slide featuring a photograph of Benson's back injuries appeared with the captions, "What was happening right before defendant drove over Angel . . . ," and ". . . you were beating the crap out of me!" *Id.* at 2. This slide also featured accompanying audio.

¶10 In addition, the prosecutor argued that jurors should not believe Glasmann's testimony. He told the jurors that the law required them to "[c]ompare Angel Benson's testimony and the testimony of the remainder of the State's witnesses to the defendant's." 8 Verbatim Report of Proceedings (VRP) at 458. The prosecutor then told jurors that in order to reach a verdict they must determine: "Did the defendant tell the truth when he testified?" *Id.*

¶11 At least five slides featured Glasmann's booking photograph and a caption. In one slide, the booking photo appeared above the caption, "DO YOU BELIEVE HIM?" State's Resp. to PRP, App. G at 5. In another booking photo slide the caption read, "WHY SHOULD YOU BELIEVE

---

[1] "PowerPoint" is a registered trademark of a Microsoft graphics presentation software program.

[2] Having been obtained by public disclosure request, most of the prosecution's closing argument PowerPoint slides are attached to State's Response to Personal Restraint Petition, Appendix G (Wash. Ct. App. No. 39700-5-II). Although appendix G includes two versions of the presentation, we cite only to the shorter version, appearing second in the appendix. Three of the closing argument slides are attached to the Personal Restraint Petition, Appendix H at 8-10. None of the original slides are in the record.

ANYTHING HE SAYS ABOUT THE ASSAULT?" *Id.* Near the end of the presentation, the booking photo appeared three more times: first with the word "GUILTY" superimposed diagonally in red letters across Glasmann's battered face. PRP, App. H at 8. In the second slide the word "GUILTY" was superimposed in red letters again in the opposite direction, forming an "X" shape across Glasmann's face. *Id.* at 9. In the third slide, the word "GUILTY," again in red letters, was superimposed horizontally over the previously superimposed words. *Id.* at 10. As best as we can determine, the prosecutor stated the following while the "GUILTY" slides were being displayed:

> You've been provided with a number of lesser crimes if you believe the defendant is not guilty of the crimes for which the State has charged him, but the evidence in this case proves overwhelmingly that he is guilty as charged, and that's what the State asks you to return in this case: Guilty of assault in the first degree; guilty of attempted robbery in the first degree; guilty of kidnapping in the first degree; and guilty of obstructing a police officer. Hold him accountable for what he did on October 23rd, 2004, by finding him guilty as charged. Thank you.

8 VRP at 465-66. Defense counsel did not object to these slides.

¶12 In closing argument, defense counsel emphasized the governing standard: proof beyond a reasonable doubt. He asked the jurors to focus on the actual charges, not Glasmann's drug use, reckless driving, or "hitting Angel Benson in the motel room." *Id.* at 470. Counsel reviewed the elements of each charge and argued that Glasmann's conduct did not meet the definition of the charged crimes:

> The issue for you to decide is[,] is there proof beyond a reasonable doubt that Mike Glasmann committed any crimes that night, and the answer to that is yes, but this case is overcharged.
>
> What do I mean by that? I mean that the charges that the State has leveled against Mr. Glasmann are not reflective of

what, in reality, happened that night or reflective of what has been proven beyond a reasonable doubt happened that night. He's charged with Assault 1 when only assault in the third degree or assault in the fourth degree reasonably fit these facts, arguably, beyond a reasonable doubt. He's charged with attempted robbery in the first degree when only attempted robbery in the second degree fits these facts beyond a reasonable doubt. He's charged with kidnapping in the first degree when only unlawful imprisonment fits these facts beyond a reasonable doubt. Obstructing a law enforcement officer is, I said, a proper charge.

*Id.* at 494.

¶13 The jury convicted Glasmann of first degree kidnapping and obstruction, and the lesser included offenses of second degree assault and attempted second degree robbery. Glasmann appealed. He was sentenced to 210 months in prison. The Court of Appeals affirmed in an unpublished decision. *State v. Glasmann,* noted at 142 Wn. App. 1041, 2008 WL 186783, 2008 Wash. App. LEXIS 177. Thereafter, Glasmann filed a personal restraint petition and we granted review limited to whether the prosecutor's closing argument deprived Glasmann of a fair trial and whether assistance of Glasmann's trial counsel was ineffective.[3] *In re Pers. Restraint of Glasmann,* 170 Wn.2d 1009, 245 P.3d 226 (2010).

## ANALYSIS

■ ■ ¶14 The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution. *Estelle v. Williams,* 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976); *State v. Finch,* 137 Wn.2d 792, 843, 975 P.2d 967 (1999). Prosecutorial misconduct may deprive a defendant of his

---

[3] We need not reach the ineffective assistance of trial counsel claim because we remand for a new trial based on the prosecutorial misconduct claim.

constitutional right to a fair trial. *State v. Davenport*, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984). "A ' "[f]air trial" certainly implies a trial in which the attorney representing the state does not throw the prestige of his public office . . . and the expression of his own belief of guilt into the scales against the accused.' " *State v. Monday*, 171 Wn.2d 667, 677, 257 P.3d 551 (2011) (alteration in original) (quoting *State v. Case*, 49 Wn.2d 66, 71, 298 P.2d 500 (1956)); *see State v. Reed*, 102 Wn.2d 140, 145-47, 684 P.2d 699 (1984).

¶15 Although a prosecutor has wide latitude to argue reasonable inferences from the evidence, *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011), a prosecutor must "seek convictions based only on probative evidence and sound reason," *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991); *State v. Huson*, 73 Wn.2d 660, 663, 440 P.2d 192 (1968). "The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury." AM. BAR ASS'N, STANDARDS FOR CRIMINAL JUSTICE std. 3-5.8(c) (2d ed. 1980); *State v. Brett*, 126 Wn.2d 136, 179, 892 P.2d 29 (1995); *State v. Belgarde*, 110 Wn.2d 504, 755 P.2d 174 (1988).

¶16 In order to prevail on a claim of prosecutorial misconduct, a defendant is required to show that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial. *Thorgerson*, 172 Wn.2d at 442. To show prejudice requires that the defendant show a substantial likelihood that the misconduct affected the jury verdict. *Id.*; *State v. Ish*, 170 Wn.2d 189, 195, 241 P.3d 389 (2010); *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). Because Mr. Glasmann failed to object at trial, the errors he complains of are waived unless he establishes that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice. *Thorgerson*, 172 Wn.2d at 443; *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994).

¶17 Our courts have repeatedly and unequivocally denounced the type of conduct that occurred in this case.

First, we have held that it is error to submit evidence to the jury that has not been admitted at trial. *State v. Pete*, 152 Wn.2d 546, 553-55, 98 P.3d 803 (2004). The "long-standing rule" is that " 'consideration of any material by a jury not properly admitted as evidence vitiates a verdict when there is a reasonable ground to believe that the defendant may have been prejudiced.' " *Id.* at 555 n.4 (emphasis omitted) (quoting *State v. Rinkes*, 70 Wn.2d 854, 862, 425 P.2d 658 (1967)); *see also, e.g., State v. Boggs*, 33 Wn.2d 921, 207 P.2d 743 (1949), *overruled on other grounds by State v. Parr*, 93 Wn.2d 95, 606 P.2d 263 (1980).

¶18 In *Rinkes*, 70 Wn.2d at 855, for example, a newspaper editorial and cartoon highly critical of what it claimed was lenient court decisions and liberal probation policies was inadvertently sent to the jury room. The court stated that the material in the newspaper should not have gone to the jury and observed that the article was "clearly intended to influence the readers of it [(the newspaper)] to be concerned about the purported leniency" of area judges and "may well have evoked a jury members feelings or convictions of the necessity for being stricter and less careful about observing legal principles and procedure in dealing with defendants accused of crime." *Id.* at 862-63. The court said the material was "very likely indeed" to be prejudicial and assumed that "the requisite balance of impartiality was upset." *Id.* at 863.

¶19 Here, the prosecutor intentionally presented the jury with copies of Glasmann's booking photograph altered by the addition of phrases calculated to influence the jury's assessment of Glasmann's guilt and veracity. In the photograph, Glasmann is unkempt and bloody, a condition likely to have resulted in even greater impact because of captions that challenged the jury to question the truthfulness of his testimony. While the State argues that it merely combined the booking photograph, admitted as exhibit 89, with the court's instructions and argument of the law and facts, the prosecutor's conduct went well

beyond this. Indeed, here the prosecutor's modification of photographs by adding captions was the equivalent of unadmitted evidence. There certainly was no photograph in evidence that asked, "DO YOU BELIEVE HIM?" *See* State's Resp. to PRP, App. G at 5. There was nothing that said, "WHY SHOULD YOU BELIEVE ANYTHING HE SAYS ABOUT THE ASSAULT?" *See id.* And there were no sequence of photographs in evidence with "GUILTY" on the face or "GUILTY, GUILTY, GUILTY." *See id.* Yet this "evidence" was made a part of the trial by the prosecutor during closing argument.

¶20 Although this is not a case where unadmitted evidence was sent to the jury room, as in *Pete* and *Rinkes*, these cases nevertheless establish that a prosecutor must be held to know that it is improper to present evidence that has been deliberately altered in order to influence the jury's deliberations. As in *Rinkes*, the multiple altered photographs here may well have affected the jurors' feelings about the need to strictly observe legal principles and the care it must take in determining Glasmann's guilt.

¶21 It is also well established that a prosecutor cannot use his or her position of power and prestige to sway the jury and may not express an individual opinion of the defendant's guilt, independent of the evidence actually in the case. The commentary on *American Bar Association Standards for Criminal Justice* std. 3-5.8 emphasizes:

> The prosecutor's argument is likely to have significant persuasive force with the jury. Accordingly, the scope of argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct. Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office but also because of the fact-finding facilities presumably available to the office.

¶22 Likewise, many cases warn of the need for a prosecutor to avoid expressing a personal opinion of guilt. *E.g.,*

*State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221 (2006) (finding it improper for a prosecuting attorney to express his individual opinion that the accused is guilty, independent of the testimony in the case (quoting *State v. Armstrong*, 37 Wash. 51, 54-55, 79 P. 490 (1905))); *Dhaliwal*, 150 Wn.2d at 577 (permitting latitude to attorneys to argue the facts in evidence and reasonable inferences therefrom, but prohibiting statements of personal belief of a defendant's guilt or innocence); *State v. Stith*, 71 Wn. App. 14, 21-22, 856 P.2d 415 (1993) (deeming a prosecutor's comment in closing argument that the appellant " 'was just coming back and he was dealing [drugs] again' " impermissible opinion " 'testimony' "); *State v. Traweek*, 43 Wn. App. 99, 107, 715 P.2d 1148 (1986) (concluding it was error for a prosecutor to tell the jury he " 'knew' " the defendant committed the crime). By expressing his personal opinion of Glasmann's guilt through both his slide show and his closing arguments, the prosecutor engaged in misconduct.

¶23 The case law and professional standards described above were available to the prosecutor and clearly warned against the conduct here. We hold that the prosecutor's misconduct, which permeated the state's closing argument, was flagrant and ill intentioned.

¶24 Moreover, the misconduct here was so pervasive that it could not have been cured by an instruction. "[T]he cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect." *State v. Walker*, 164 Wn. App. 724, 737, 265 P.3d 191 (2011) (citing *Case*, 49 Wn.2d at 73).

¶25 Highly prejudicial images may sway a jury in ways that words cannot. *See State v. Gregory*, 158 Wn.2d 759, 866-67, 147 P.3d 1201 (2006). Such imagery, then, may be very difficult to overcome with an instruction. *Id.* Prejudicial imagery may become all the more problematic when displayed in the closing arguments of a trial, when the jury members may be particularly aware of, and susceptible to,

the arguments being presented. Given the multiple ways in which the prosecutor attempted to improperly sway the jury and the powerful visual medium he employed, no instruction could erase the cumulative effect of the misconduct in this case. The prosecutor essentially produced a media event with the deliberate goal of influencing the jury to return guilty verdicts on the counts against Glasmann.

¶26 We also believe there is a substantial likelihood that the misconduct affected the jury verdict. As noted earlier, the State charged Glasmann with first degree assault, attempted first degree robbery, first degree kidnapping, and obstruction. The mental state required for the charged offenses, specifically intent, was critically important. Glasmann presented evidence that he lacked both the opportunity and capacity to form the intent necessary to commit the charged crimes. There was evidence that he consumed alcohol, methamphetamine, and ecstasy the night of the offenses and evidence that the events involving Glasmann, Benson, and law enforcement unfolded rapidly. Glasmann defended on the basis that the facts only supported a guilty verdict as to third or fourth degree assault, attempted robbery in the second degree, unlawful imprisonment, and obstruction. The jury convicted Glasmann of second degree assault, attempted second degree robbery, first degree kidnapping, and obstruction.

¶27 A prosecutor could never shout in closing argument that "Glasmann is guilty, guilty, guilty!" and it would be highly prejudicial to do so. Doing this visually through use of slides showing Glasmann's battered face and superimposing red capital letters (red, the color of blood and the color used to denote losses) is even more prejudicial. *See Gregory*, 158 Wn.2d at 866-67. "[V]isual arguments manipulate audiences by harnessing rapid unconscious or emotional reasoning processes and by exploiting the fact that we do not generally question the rapid conclusions we reach based on visually presented information." Lucille A. Jewel, *Through a Glass Darkly: Using Brain and Visual Rhetoric*

*to Gain a Professional Perspective on Visual Advocacy*, 19 S.
CAL. INTERDISC. L.J. 237, 289 (2010). Further,

> [w]ith visual information, people believe what they see and will
> not step back and critically examine the conclusions they reach,
> unless they are explicitly motivated to do so. Thus, the alacrity
> by which we process and make decisions based on visual
> information conflicts with a bedrock principle of our legal
> system—that reasoned deliberation is necessary for a fair
> justice system.

*Id.* at 293 (footnote omitted) (citing William J. Bowers,
Benjamin D. Steiner & Marla Sandys, *Death Sentencing in
Black and White: An Empirical Analysis of the Role of Jurors'
Race and Jury Racial Composition*, 3 U. PA. J. CONST. L. 171,
261 (2001) (citing JEFFREY AMBRAMSON, WE, THE JURY: THE JURY
SYSTEM AND THE IDEAL OF DEMOCRACY (1994) (generally discuss-
ing the basic democratic principle for jury trials is that
deliberations should be a rational and reasoned process))).

¶28 During the critical closing moments of trial, one of
the last things the jury saw before it began its deliberations
was the representative of the State of Washington imper-
missibly flashing the word "GUILTY" across an image of
Glasmann's face three times, predisposing the jury to
return a harsh verdict. Indeed, the entire 50-plus slide
presentation used during closing argument was full of
imagery that likely inflamed the jury.[4] The prosecutor's

---

[4] "Sometimes, we are unable to rationally consider how images affect our
emotions or our decision-making process. As we are processing an image in our
pre-conscious sensory system, that image can activate an emotional reaction in
our mind without us even knowing about it." Jewel, *supra*, at 263 (citing ANN MARIE
SEWARD BARRY, VISUAL INTELLIGENCE: PERCEPTION, IMAGE, AND MANIPULATION IN VISUAL
COMMUNICATION 18 (1997); JOSEPH LEDOUX, THE EMOTIONAL BRAIN 165 (1996)). "[T]he
danger in using emotionally vivid imagery is not that it is subliminally persua-
sive, but that it tends to generate emotionally driven reactions that can uncon-
sciously affect a decision-maker's thought process." *Id.* at 254. "[T]here is evidence
that gruesome photographs cause unconscious emotional reactions—reactions
that may not be curable with a limiting instruction." *Id.* at 268-69 (citing Kevin S.
Douglas, David R. Lyon & James R.P. Ogloff, *The Impact of Graphic Photographic
Evidence on Mock Jurors' Decisions in a Murder Trial: Probative or Prejudicial?*,
21 LAW & HUM. BEHAV. 485, 499 (1997) ("[I]f jurors cannot even recognize the extent

improper visual "shouts" of GUILTY urged the jury to find Glasmann guilty as charged, and without them, the jury might have returned verdicts on the offenses Glasmann agreed he had committed.[5] Because Glasmann defended by asserting he was guilty only of lesser offenses, and nuanced distinctions often separate degrees of a crime, there is an especially serious danger that the nature and scope of the misconduct here may have affected the jury.

¶29 When viewed as a whole, the prosecutor's repeated assertions of the defendant's guilt, improperly modified exhibits, and statement that jurors could acquit Glasmann only if they believed him represent the type of pronounced and persistent misconduct that cumulatively causes prejudice demanding that a defendant be granted a new trial. *See Berger v. United States*, 295 U.S. 78, 89, 55 S. Ct. 629, 79 L. Ed. 1314 (1935); *Thomas v. Hubbard*, 273 F.3d 1164, 1179-80 (9th Cir. 2001), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815 (2002); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also Matlock v. Rose*, 731 F.2d 1236, 1244 (6th Cir. 1984).

¶30 The dissent, however, believes that reversal is not required with regard to three of the four crimes found by the jury and only the conviction for second degree assault should be reversed. The dissent says that Glasmann conceded the crimes of obstructing a law enforcement officer and second degree attempted robbery, and the jury accordingly convicted him of these crimes. With respect to the first degree kidnapping charge, the dissent maintains the evidence is overwhelming that this conviction must be upheld.

¶31 We have on a number of occasions established that reviewing claims of prosecutorial misconduct is not a matter of determining whether there is sufficient evidence to convict the defendant. In *State v. Charlton*, 90 Wn.2d

---

to which [graphic] evidence affects them, it will be impossible for them to reduce or control the impact of the evidence when instructed to do so by a judge." (second alteration in original))).

[5] It is also possible that the jury might have acquitted Glasmann on a charge.

657, 665, 585 P.2d 142 (1978), we concluded the discussion of prosecutorial misconduct in that case, which required reversal, by noting that "[i]n spite of our frequent warnings that prejudicial prosecutorial tactics will not be permitted, we find that some prosecutors continue to use improper, sometimes prejudicial means in an effort to obtain convictions. *In most of these instances, competent evidence fully sustains a conviction.*" (Emphasis added.) The issue is whether the comments deliberately appealed to the jury's passion and prejudice and encouraged the jury to base the verdict on the improper argument " 'rather than properly admitted evidence.' " *State v. Furman*, 122 Wn.2d 440, 468-69, 858 P.2d 1092 (1993) (quoting and discussing *Belgarde*, 110 Wn.2d at 507-08). The focus must be on the misconduct and its impact, not on the evidence that was properly admitted.

¶32 Thus, deciding whether reversal is required is not a matter of whether there is sufficient evidence to justify upholding the verdicts. Rather, the question is whether there is a substantial likelihood that the instances of misconduct affected the jury's verdict. *Dhaliwal*, 150 Wn.2d at 578. We do not decide whether reversal is required by deciding whether, in our view, the evidence is sufficient. *See Monday*, 171 Wn.2d at 678-80 (racist arguments required reversal; no weighing of evidence by the court); *Belgarde*, 110 Wn.2d at 507-10 (inflammatory remarks associating defendant with an organization the prosecutor described as " 'deadly group of madmen' "; misconduct required reversal; no weighing of evidence by the court); *Charlton*, 90 Wn.2d at 664 (prosecutor commented on the defendant's spouse's failure to testify, despite the marital privilege, with the inference being that the defendant was concealing or withholding testimony; reversal required—jury might have been inclined to believe the defendant's version in the absence of the improper argument).

¶33 The dissent says it agrees that whether the error requires reversal is not a matter of whether there is suffi-

cient evidence to uphold the verdicts. Dissent at 720 n.9. But weighing the evidence is in fact what the dissent does. We do not believe this analysis is appropriate and it is contrary to our precedent, as explained. If the misconduct cannot be linked to a specific count, and the misconduct is so egregious that we must conclude reversal is required on one charge, then how can we conclude the misconduct did not sway the jury on another charged crime without engaging in an inappropriate sufficiency of the evidence analysis, like the dissent has done?

¶34 In this case, the use of highly inflammatory images unrelated to any specific count was misconduct that contaminated the entire proceedings. The prosecutor's unacceptable argument announced to the jury that the defendant was intrinsically GUILTY GUILTY GUILTY. The misconduct distracted the jury from its duty to consider the evidence unaffected by the overlaid message that emphatically and repeatedly conveyed the prosecutor's belief to the jury that Glasmann is "absolutely guilty!" and which constituted an appeal to passion and prejudice on all counts.

¶35 There is a substantial likelihood here that the jury returned guilty verdicts for the offenses the jurors found because they were influenced by the prosecutor's improper closing argument and the altered "evidence" presented during argument. We cannot say that the jury would not have returned verdicts for lesser offenses, or even acquittal, i.e., we cannot even presume the jury would have accepted defense counsel's concessions even as to the obstruction charged. The impact of such powerful but unquantifiable material on the jury is exceedingly difficult to assess but substantially likely to have affected the *entirety* of the jury deliberations and its verdicts. Even the dissent agrees that the misconduct mandates reversal of the assault conviction. The requisite balance of impartiality was upset. Mr. Glasmann's right to a fair trial must be granted in full. In this way, we give substance to our message that "prejudicial prosecutorial tactics will not be permitted," and our warn-

ings that prosecutors must avoid improper, prejudicial means of obtaining convictions will not be empty words. *Charlton*, 90 Wn.2d at 665.

¶36 Next, we turn briefly to Mr. Glasmann's claim that the prosecutor improperly misstated the burden of proof. Because we reverse Glasmann's conviction based on the misconduct addressed above, we need not reach this issue, but do so in the interest of fully discussing the prosecutor's conduct.

¶37 Shifting the burden of proof to the defendant is improper argument, and ignoring this prohibition amounts to flagrant and ill-intentioned misconduct. *E.g.*, *State v. Fleming*, 83 Wn. App. 209, 213-14, 921 P.2d 1076 (1996); *Casteneda-Perez*, 61 Wn. App. at 362-63. Due process requires the prosecution to prove, beyond a reasonable doubt, every element necessary to constitute the crime with which the defendant is charged. *In re Winship*, 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Misstating the basis on which a jury can acquit insidiously shifts the requirement that the State prove the defendant's guilt beyond a reasonable doubt. *Fleming*, 83 Wn. App. at 213.[6]

¶38 Similarly, in this case the prosecutor informed the jury that in order to reach a verdict, it must decide whether the defendant told the truth when he testified. Thus, the prosecutor strongly insinuated that the jury could acquit (or find him guilty of lesser charges) only if it believed Glasmann, when the proper standard is whether the evidence established that he was guilty of the State's charges beyond a reasonable doubt. This misconduct was not as egregious as the conduct in *Fleming*, however, and in and of

---

[6] During the State's closing argument in *Fleming*, the prosecutor stated, " '[F]or you to find the defendants . . . not guilty of the crime of rape in the second degree, . . . you would have to find either that [the victim] has lied about what occurred . . . or that she was confused.' " *Fleming*, 83 Wn. App. at 213 (emphasis omitted) (quoting court proceedings). This was error because it misstated the basis upon which the jury could acquit and shifted the burden to the defendant to disprove the State's case. *Id.* at 214. A prosecutor who argues that to acquit the defendant the jury must find that the State's witnesses are lying or mistaken commits misconduct. *Id.*

itself would probably not justify reversal. However, it was clearly misconduct for the prosecutor to inform the jury that acquittal was appropriate only if the jury believed Glasmann and shows the prosecutor's failure to prosecute this case as an impartial officer of the court.

## CONCLUSION

¶39 The prosecutor's presentation of a slide show including alterations of Glasmann's booking photograph by addition of highly inflammatory and prejudicial captions constituted flagrant and ill intentioned misconduct that requires reversal of his convictions and a new trial, notwithstanding his failure to object at trial. Considering the entire record and circumstances of this case, there is a substantial likelihood that this misconduct affected the jury verdict. The principal disputed matter at trial was whether Glasmann was guilty of lesser offenses rather than those charged, and this largely turned on whether the requisite mental element was established for each offense. More fundamentally, the jury was required to conclude that the evidence established Glasmann's guilt of each offense beyond a reasonable doubt.

¶40 It is substantially likely that the jury's verdict was affected by the prosecutor's improper declarations that the defendant was "GUILTY, GUILTY, GUILTY!," together with the prosecutor's challenges to Glasmann's veracity improperly expressed as superimposed messages over the defendant's bloodied face in a jail booking photograph.

¶41 We reverse the defendant's convictions and remand for a new trial.

C. JOHNSON and STEPHENS, JJ., and ALEXANDER, J. PRO TEM., concur.

¶42 CHAMBERS, J. (concurring) — I agree with the lead opinion that the prosecutor's misconduct in this case

was so flagrant and ill intentioned that a curative instruction would not have cured the error and that the defendant was prejudiced as a result of the misconduct. *See State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997). I write separately because I was stunned that the State argued to this court there was nothing improper with the prosecutor showing the jury a photo of the defendant digitally altered to look more like a "wanted" poster than properly admitted evidence. It was the State's view in oral argument that the PowerPoint slide in question was merely an instance of using modern techniques to present stimulating closing arguments. It was the State's position that the State may add "guilty" to the text of a PowerPoint presentation and therefore that it does not cross the line to add the text "guilty" to the photograph itself.

¶43 Under the State's logic, in a shooting case, there would be nothing improper with the State altering an image of the accused by photoshopping a gun into his hand to illustrate the State's version of how the shooting must have occurred. In my view, the State in this case does not understand its role in ensuring a fair trial and the courts must establish the boundary lines. *See State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011) ("The prosecutor owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated."); *State v. Thorgerson*, 172 Wn.2d 438, 462, 258 P.3d 43 (2011) (Chambers, J., dissenting) ("The proper measure of the success of any prosecutor is the prosecutor's devotion to the law, fidelity to the rules of the court and rules of evidence, and dedication to guarding the protections our constitutions and laws afford every person, including the accused."). Adding the word "guilty" to the PowerPoint slide was improper, whether in the text or splashed across the defendant's photo.

¶44 Certainly, lawyers may and should use technology to advance advocacy and judges should permit and even encourage new techniques. But we must all remember the

only purpose of visual aids of any kind is to enhance and assist the jury's understanding of the evidence. Technology should never be permitted to dazzle, confuse, or obfuscate the truth. The jury's deliberations must be based solely upon the evidence admitted and the court's instructions, not upon whose lawyer does the best job of manipulating, altering, shuffling, or distorting the evidence into some persuasive visual kaleidoscope experience for the jury.

¶45 This was not a "he said, she said" case. Edward Glasmann's actions were captured on videotape by the security camera of the minimart. The State also had the testimony of five police officers, the witness who called 911, the 911 tape itself, and the victim, which altogether gave a real-time account of the entire incident. There was absolutely no need for the prosecutor to alter an exhibit to demonize the defendant. I can only conclude the prosecutor's misconduct was flagrant and ill intentioned and designed to inflame the passions of the jury. *See Stenson*, 132 Wn.2d at 719. Turning Glasmann's photo into a poster one might expect to see on the wall of an Old West saloon was completely unnecessary, and I cannot say the misconduct did not affect the verdict in this case. *See State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995). I agree with the lead opinion that Glasmann's conviction should be reversed and the case remanded for a new trial.

¶46 WIGGINS, J. (dissenting) — I agree with the lead opinion that the prosecutor in this case improperly expressed a personal opinion about Edward Glasmann's guilt when he superimposed the words "guilty, guilty, guilty" over Glasmann's mug shot in a PowerPoint display. But I disagree that all of Glasmann's convictions should be overturned as a result. While it may appear at first glance that the prosecutor's error is grave enough to warrant a new trial on all of Glasmann's convictions, a closer examination of the facts reveals a different story.

¶47 During closing arguments, Glasmann's attorney stated, "You have basically four trials here. You have four counts, four accusations, if you will. Each one of those is a separate trial. Each one of those must be decided separately from the other and we rely on you to do the necessary mental gymnastics to accomplish that." 8 Verbatim Report of Proceedings (VRP) at 471. Glasmann's attorney's advice to the jury is equally applicable to our review. After engaging in the "mental gymnastics" urged by Glasmann's attorney, I cannot agree that we should reverse his convictions for obstruction of a law enforcement officer, attempted second degree robbery, and first degree kidnapping. For each of these convictions, either Glasmann admitted to the crime or the evidence was so overwhelming that the jury would have convicted him regardless of the prosecutor's improper conduct. Nor can I agree that the prosecutor's statements during closing argument shifted the burden of proof to Glasmann. For these reasons, I respectfully dissent.

## Prosecutorial Misconduct

¶48 To prevail on a prosecutorial misconduct claim, a defendant must show not only that the prosecutor's conduct was improper but also that it was prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). " 'Prejudice is established only if there is a substantial likelihood [that] the instances of misconduct affected the jury's verdict.' " *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (alteration in original) (quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995) and citing *State v. Evans*, 96 Wn.2d 1, 5, 633 P.2d 83 (1981)). "If the prejudice could have been cured by a jury instruction, but the defense did not request one, reversal is not required." *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003); *State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994). Here, because Glasmann's attorney did not object to the prosecution's slides or request a curative instruction at

trial, Glasmann must show that the prejudice[7] was so inflammatory that it could not have been defused by an instruction. *State v. Coleman*, 152 Wn. App. 552, 570, 216 P.3d 479 (2009).

## A. Prejudice

¶49 Glasmann was convicted of four separate crimes, and factually, each conviction is different. It is a mistake to bunch all four convictions together and conclude that the prosecutor's improper conduct prejudiced each conviction the same. After analyzing Glasmann's four convictions separately, it is clear that three of them should stand and only one should be reversed.

### 1. Obstructing a Law Enforcement Officer

¶50 During closing arguments, Glasmann's attorney conceded that Glasmann "clearly obstructed a law enforcement officer in the exercise of their official duties," 8 VRP at 472-73 and admitted, "I'll be the most surprised person in this courtroom if you don't convict Mr. Glasmann of obstructing a law enforcement officer." *Id.* at 472. Not surprisingly, the jury found Glasmann guilty of obstructing a law enforcement officer. In light of his concession, Glasmann cannot seriously contend that he was prejudiced by the prosecutor's actions during closing argument. The jury found Glasmann guilty because he admitted he was guilty, not because of the prosecutor's improper conduct. The lead opinion is wrong to conclude the prosecutor's conduct prejudiced Glasmann on his obstruction charge; I would uphold that conviction.[8]

---

[7] "[T]he inherent prejudice standard does not require us to know how jurors reacted to [the PowerPoint slides]. A defendant need not show that jurors 'actually articulated a consciousness of some prejudicial effect.'" *State v. Jaime*, 168 Wn.2d 857, 864 n.4, 233 P.3d 554 (2010) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 570, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986)).

[8] The lead opinion appears to misunderstand our posture on review when it says, "We cannot say that the jury would not have returned verdicts for lesser offenses, or even acquittal, i.e., we cannot even presume the jury would have

## 2. Attempted Second Degree Robbery

¶51 Glasmann also conceded attempted second degree robbery. The State charged him with attempted *first degree* robbery, and he defended by arguing that the facts supported only attempted *second degree* robbery. Glasmann's attorney argued in closing that "Mr. Glasmann admits[,] 'I was trying to steal his car,' and that's attempted robbery. The only issue is attempted first degree robbery or attempted second degree robbery. Clearly what Mr. Glasmann admitted to was attempted robbery in the second degree." *Id.* at 488-89. This was a strategic decision by Glasmann; he admitted to committing attempted second degree robbery because he *wanted* the jury to find him guilty of that crime, which the evidence plainly supported, and not of first degree robbery. Glasmann's gambit worked and the jury found him guilty of attempted second degree robbery.

¶52 Glasmann cannot reasonably claim the prosecutor's conduct resulted in any prejudice when the jury returned the same verdict Glasmann sought. Just like with the obstruction charge, the lead opinion is wrong to reverse his conviction. Recognizing this, I would uphold Glasmann's attempted second degree robbery conviction.

## 3. First Degree Kidnapping

¶53 Although Glasmann did not concede he was guilty of first degree kidnapping, the evidence of his guilt is so

---

accepted defense counsel's concessions even as to the obstruction charged." Lead opinion at 712. This seems to assume that the burden is on the State to show harmlessness, perhaps even beyond a reasonable doubt. This assumption is incorrect. A defendant making a claim of prosecutorial misconduct carries the burden of showing a " 'substantial likelihood [that] the instances of misconduct affected the jury's verdict.' " *Magers*, 164 Wn.2d at 191 (alteration in original) (quoting *Pirtle*, 127 Wn.2d at 672). Thus, we are not required to reverse based on unlikely hypotheticals such as the jury acquitting where defense counsel did not even ask for acquittal, saying, for example, that he would be "the most surprised person in the courtroom" if the jury acquitted. 8 VRP at 472. It is, of course, *possible* that the jury would have reached a different outcome absent the misconduct, but that does not equate to a substantial likelihood.

overwhelming that there is no way the prosecutor's improper conduct prejudiced the jury's guilty verdict.[9] Glasmann defended the first degree kidnapping charge by arguing that his actions inside the minimart only amounted to unlawful imprisonment. The jury disagreed and convicted him of first degree kidnapping.

¶54 "A person commits the crime of kidnapping in the first degree when he or she intentionally abducts another person with intent to hold the person as a shield or hostage." Jury Instruction 30. "Abduct means to restrain a person by using or threatening to use deadly force." Jury Instruction 31. "Restraint or restrain means to restrict another person's movements without consent and without legal authority in a manner which interferes substantially with that person's liberty. Restraint is without consent if it is accomplished by physical force, intimidation or deception." Jury Instruction 32.

¶55 The record is replete with video evidence and multiple-eyewitness testimony establishing that Glasmann was guilty of first degree kidnapping. Angel Benson testified that while in the minimart, Glasmann held her around the neck so that she could not breathe, that she was not there willingly, and that she struggled to try and get away. 4 VRP 95, 100, 111. Three officers also testified that Glasmann held Benson in a choke hold, and minimart surveillance tapes confirmed this testimony. 4 VRP at 118-19; 5 VRP at 261; 6 VRP at 302. Officers Borchardt and Butts both testified to hearing Glasmann threaten to kill Benson. 4 VRP at 71; 5 VRP at 246. Further, Dr. Eggebroten testified that application of pressure to someone's neck

---

[9] The lead opinion is correct that "deciding whether reversal is required is not a matter of whether there is sufficient evidence to justify upholding the verdicts." Lead opinion at 711. I agree there is more to the analysis than that. But the quantity and quality of evidence will often factor into our analysis of whether a verdict would have been different absent an error. For example, where the evidence of guilt is overwhelming, it is less likely that an error affected the outcome of the trial than where evidence of guilt is slight. *See In re Pers. Restraint of Davis*, 152 Wn.2d 647, 698-701, 101 P.3d 1 (2004).

could be life threatening. 5 VRP at 207. In short, the evidence at trial clearly established that Glasmann abducted Benson.

¶56 Additionally, the evidence that Glasmann intended to use Benson as a shield was overwhelming. Several officers testified that Glasmann positioned Benson between himself and the officers who had their guns drawn, 4 VRP at 119; 5 VRP at 248; 6 VRP at 305, with Officer Hamilton stating Glasmann positioned Benson "directly in front of him so that she was a physical barrier like a shield." 6 VRP at 305. The surveillance tape captured this scene, confirming the officers' testimony. This tape was played several times for the jurors. Given the abundance of evidence proving Glasmann guilty of first degree kidnapping, there is no question that the jury would have found Glasmann guilty even absent the prosecutor's improper conduct. Therefore, Glasmann was not prejudiced, and we should uphold his first degree kidnapping conviction.

### 4. Second Degree Assault

¶57 In contrast, it does appear that Glasmann was prejudiced on his second degree assault conviction, and I agree with the lead opinion that we should reverse that conviction. Glasmann defended the first degree assault charge by arguing that he did not intentionally assault Benson, a required element of first degree assault,[10] and that running over Benson with his car amounted only to third[11] or fourth

---

[10] "A person commits the crime of assault in the first degree when, with intent to inflict great bodily harm, he assaults another by any force or means likely to produce great bodily harm or death." Jury Instruction 7.

[11]
A person commits the crime of assault in the third degree when under circumstances not amounting to assault in either the first or second degree he or she
(1) with criminal negligence causes bodily harm to another person by means of a weapon or other instrument or thing likely to produce bodily harm, or
(2) with criminal negligence, causes bodily harm accompanied by substantial pain that extends for a period sufficient to cause considerable suffering. Jury Instruction 17.

degree assault.[12] The jury convicted Glasmann of second degree assault, a lesser included offense also requiring proof of intent.[13]

¶58 At trial, the evidence that Glasmann intended to run over Benson was limited. Benson admitted to falling down while trying to escape the moving car before being run over. 4 VRP at 82. Additionally, Erika Rusk, the State's witness who called 911, testified that she did not know if Glasmann knew Benson was under the car when he ran her over. 2 VRP at 21. Yet the jury still found that Glasmann intentionally assaulted Benson. Given the limited evidence establishing Glasmann's intent to run over Benson and the nuanced distinctions between the different degrees of assault, I agree with the lead opinion that the prosecutor's improper conduct prejudiced Glasmann by affecting the jury's verdict. Further, this misconduct was so flagrant that no curative instruction could have cured the prejudice. I agree that we should reverse Glasmann's second degree assault conviction.

B. The Prosecution Did Not Improperly Shift the Burden of Proof

¶59 While I readily condemn the prosecutor's improper conduct in this case, I cannot countenance the inclusion of any alleged burden shift among that conduct because nothing the prosecutor said during closing argument shifted the burden of proof to Glasmann. It is misconduct for a prosecutor to argue that a jury must find that the State's witnesses are either lying or mistaken in order to acquit a defendant. *State v. Fleming*, 83 Wn. App. 209, 213, 921 P.2d 1076 (1996) (citing *State v. Casteneda-Perez*, 61

---

[12] "A person commits the crime of assault in the fourth degree when he or she commits an assault not amounting to assault in the first, second, or third degree." Jury Instruction 20.

[13] "A person commits the crime of assault in the second degree when he or she intentionally assaults another and thereby recklessly inflicts substantial bodily harm." Jury Instruction 13.

Wn. App. 354, 362-63, 810 P.2d 74 (1991)). Misstating the basis on which a jury can acquit insidiously shifts the requirement that the State prove the defendant is guilty beyond a reasonable doubt. *Id.*

¶60 A comparison with the Court of Appeals, Division One, decision in *Fleming* is instructive here. In *Fleming*, the defendants alleged the prosecutor committed misconduct during closing argument by telling the jury that " *'for you to find the defendants . . . not guilty of the crime of rape in the second degree, . . . you would have to find either that [D.S.] has lied about what occurred in that bedroom or that she was confused; essentially that she fantasized what occurred back in that bedroom.' " Fleming*, 83 Wn. App. at 213 (third alteration in original). Division One held that the prosecutor's statement misstated the law and misrepresented both the role of the jury and the burden of proof. *Id.*

¶61 Here, unlike in *Fleming*, the prosecutor neither misstated the law nor shifted the burden of proof. The prosecutor simply highlighted the jury's role in determining the credibility of witnesses and admonished the jury to "[c]ompare Angel Benson's testimony and the testimony of the remainder of the State's witnesses to the defendant's. The defendant got up and he testified in this case, and the question to you is do you believe him?" 8 VRP at 458. The prosecutor never "informed the jury that in order to reach a verdict, it must decide whether the defendant told the truth when he testified." Lead opinion at 713.

¶62 The prosecutor's question asked the jury to do its job and assess Glasmann's credibility vis-à-vis the State's witnesses. "Merely asking questions of the jury does not rise to the level of misstating the law or misrepresenting the role of the jury and the burden of proof as in *Fleming*." *State v. Lewis*, 156 Wn. App. 230, 241, 233 P.3d 891 (2010). In *Fleming*, the prosecutor required the jury to find the victim either lied or was mistaken *in order to find the defendant not guilty*. Here, the prosecutor's question did not impose any prerequisite to finding the defendant not guilty. The

prosecutor merely asked the jury to compare the testimony of the State's witnesses to that of the defendant, and to determine if the defendant told the truth. This is a standard credibility determination that our justice system charges to the jury. Thus, the prosecutor neither misstated the law nor shifted the burden of proof and this portion of the prosecutor's closing argument was not misconduct as the lead opinion contends.

C. Prosecutors May Use Visual Aids

¶63 Although I agree that the prosecutor's inclusion of an altered version of Glasmann's mug shot proclaiming Glasmann "guilty, guilty, guilty" was improper, I do not condemn the use of visual aids generally. When properly created and employed, visual aids can be both effective and helpful during closing argument and I would not discourage their use. I do not read the lead opinion as limiting the proper use of visual aids either. However, I join the lead opinion in condemning the improper use of these aids when they are tantamount to improper closing argument, as was the case here.

¶64 For the foregoing reasons, I dissent. I would reverse Glasmann's second degree assault conviction and remand for further proceedings consistent with this opinion.

OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur with WIGGINS, J.

Reconsideration denied December 19, 2012.