**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILED
9/19/2022
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 82889-4-I |
| Respondent, | DIVISION ONE |
| v. | |
| IBARRA-ERIVES, JESUS H., DOB: 08/05/1980, | PUBLISHED OPINION |
| Appellant. | |

BOWMAN, J. — Jesus H. Ibarra-Erives[1] appeals his conviction for possession of a controlled substance with intent to deliver. He argues insufficient evidence supports the jury's conclusion that he constructively possessed illegal drugs. Alternatively, he claims the trial court improperly dismissed a potential juror for cause and the prosecutor engaged in race-based misconduct. He also argues the trial court erroneously imposed supervision fees. We conclude sufficient evidence supports the jury's verdict that Ibarra-Erives possessed controlled substances with intent to deliver. But we reverse his conviction on prosecutorial misconduct grounds and remand.

FACTS

In June 2018, the Snohomish Regional Drug Task Force executed a search warrant to recover drugs and related evidence in an apartment rented to a

---

[1] We note that the charging information hyphenates Ibarra-Erives' name, as does the defense briefing below. But on appeal, defense counsel does not use a hyphen. We hyphenate Ibarra-Erives' name in the caption in accordance with RAP 3.4 and throughout the opinion to be consistent with the briefing below. However, we recognize the inconsistency and intend no disrespect.

Citations and pin cites are based on the Westlaw online version of the cited material.

No. 82889-4-I/2

man named Javier Romo Meza. Armed officers wearing tactical vests and helmets descended on the apartment. Using a "soft . . . ruse-type knock" and saying she was "management," a detective persuaded Ibarra-Erives to open the door. Officers then "pulled him out onto the front landing" and arrested him.

Inside the apartment, officers found one locked, unoccupied bedroom they believed belonged to Romo Meza. The locked bedroom contained no contraband. But on the kitchen counter, police found white powder later determined to be methamphetamine.

In a second unlocked bedroom that police labeled as "KK" for evidentiary purposes, they found a man identified as Isaias Leon Reynaga. On the closet shelf in that room, officers discovered a backpack. The backpack contained seven one-ounce "bindles" of methamphetamine and five bindles of heroin that would have sold for close to $8,000 on the street. The backpack did not contain any information identifying its owner. On the shelf next to the backpack, police found a digital scale and a box of plastic sandwich bags.

After questioning Leon Reynaga, police determined he did not have any ties to the apartment other than as a momentary visitor. Ibarra-Erives, on the other hand, admitted that he "temporarily" lived at the apartment. He told police he sometimes slept on the couch and sometimes on the pile of blankets officers observed in bedroom KK where they found the backpack.[2] Ibarra-Erives said the prescription medication and clothes found on the floor of the bedroom were his. But he denied owning the backpack. When police searched Ibarra-Erives'

---

[2] The room had no bed.

No. 82889-4-I/3

pockets, they found a broken glass pipe used for smoking methamphetamine that had white residue and burn marks on it. He also had $591 in cash in his wallet.

The State charged Ibarra-Erives with unlawful possession of a controlled substance with intent to manufacture or deliver. At trial, Ibarra-Erives, who is Latinx, used a Spanish interpreter. During the State's case in chief, the prosecutor questioned the lead detective about the amount of drugs found in the backpack in room KK. The detective testified that each "bindle" of methamphetamine weighed 28 grams, or 1 ounce. He then described the bindles of heroin, which each weighed 24.6 grams. He explained that for heroin, "25 grams is considered an ounce." When asked why, the detective responded, "I don't know what the answer is to why, but the term on the street is it's a Mexican ounce across the board, regardless of who is selling or buying 25 grams of a Mexican ounce." Then in his closing argument to the jury, the prosecutor twice emphasized that each bindle of heroin had been packaged as a "Mexican ounce."

The jury convicted Ibarra-Erives as charged and the court imposed a standard-range sentence of 16 months. Ibarra-Erives appeals.

ANALYSIS

Ibarra-Erives argues insufficient evidence supports the jury's determination that he constructively possessed a controlled substance. Alternatively, he seeks a new trial, alleging the prosecutor committed race-based misconduct by using the term "Mexican ounce" to explain how the heroin was

3

packaged. According to Ibarra-Erives, the prosecutor's remarks suggested that a Latinx person likely packed or possessed the drugs. Ibarra-Erives also asserts error during jury selection warrants a new trial and the trial court erred by imposing discretionary supervision fees.

<u>Sufficiency of the Evidence</u>

Ibarra-Erives contends the State proved only his mere proximity to the backpack but did not show he exercised sufficient dominion and control over it or the apartment to support constructive possession of the drugs. We disagree.

The State must produce evidence to satisfy every element of a criminal offense. <u>State v. Chacon</u>, 192 Wn.2d 545, 549, 431 P.3d 477 (2018). Evidence supports a criminal conviction if any rational trier of fact could have found guilt beyond a reasonable doubt. <u>State v. Listoe</u>, 15 Wn. App. 2d 308, 326, 475 P.3d 534 (2020). In raising a sufficiency challenge, the defendant admits the truth of the State's evidence. <u>Id.</u> We view the evidence and all reasonable inferences arising from it in the light most favorable to the State. <u>Id.</u> We treat circumstantial evidence and direct evidence equally. <u>Id.</u>

Possession can be either actual or constructive. <u>State v. Reichert</u>, 158 Wn. App. 374, 390, 242 P.3d 44 (2010). "Actual possession" requires the individual to have physical custody of a given item. <u>Id.</u> "Constructive possession" exists where the individual has "dominion and control" over that item. <u>Id.</u> Control need not be exclusive to the defendant to establish possession. <u>State v. George</u>, 146 Wn. App. 906, 920, 193 P.3d 693 (2008). We examine the totality of the circumstances to determine whether an individual has dominion

4

No. 82889-4-I/5

and control over an item. State v. Lakotiy, 151 Wn. App. 699, 714, 214 P.3d 181 (2009). One factor we consider is whether the individual could readily convert the item to his actual possession. State v. Jones, 146 Wn.2d 328, 333, 45 P.3d 1062 (2002). We also consider physical proximity as part of our inquiry, though physical proximity alone does not establish constructive possession. Id.; State v. Chouinard, 169 Wn. App. 895, 899, 282 P.3d 117 (2012) (mere proximity insufficient to show dominion and control).

Constructive possession may also exist if the individual had dominion and control over the broader premises in which the item was located. State v. Shumaker, 142 Wn. App. 330, 334, 174 P.3d 1214 (2007). Dominion and control over a premises creates a rebuttable presumption that the person also has dominion and control over items within the premises. Reichert, 158 Wn. App. at 390. But mere knowledge that an item exists on the premises does not amount to dominion and control. Chouinard, 169 Wn. App. at 899.

Ibarra-Erives cites George and State v. Callahan, 77 Wn.2d 27, 459 P.2d 400 (1969), for the proposition that absent ownership, proximity alone does not amount to possession. In George, the court concluded the defendant did not exercise dominion and control over a vehicle as a mere "backseat passenger," whereas the driver actually owned the car. 146 Wn. App. at 920.[3] Police also could not forensically tie the passenger to the drugs and he showed no signs of consuming them. Id. at 922. In Callahan, police searching a houseboat found

---

[3] Ibarra-Erives cites two other cases reaching similar conclusions, State v. Cote, 123 Wn. App. 546, 96 P.3d 410 (2004), and State v. Enlow, 143 Wn. App. 463, 178 P.3d 366 (2008). As in George, the defendants in those cases had no connection to the vehicles containing illegal drugs other than as passengers. Cote, 123 Wn. App. at 550; Enlow, 143 Wn. App. at 469.

5

defendants Hutchinson and Dolan in the living room, sitting at a desk with "various pills and hypodermic syringes" and a box of drugs on the floor between them. 77 Wn.2d at 28. Defendant Callahan was the tenant of the houseboat. Id. Hutchinson claimed he had been a guest on the boat for two to three days. Id. While Hutchinson denied that he owned the drugs, he admitted that he handled them earlier in the day and that he owned the guns and scales consistent with drug use officers found in the houseboat. Id. The court determined Hutchinson did not exercise dominion and control over the houseboat because he did not live there as a tenant or subtenant, had no responsibility for maintaining the premises, and did not keep private items like clothes or toiletries there. Id. at 31.[4] The court also pointed to the admission of a fourth individual that "the drugs belonged to him; that he had brought them onto the boat; that he had not sold them or given them to anyone else; and that he had sole control over them." Id.

Both cases are distinguishable. Unlike George, the State here presented evidence of proximity "coupled with 'other circumstances linking him to the [drugs].'" George, 146 Wn. App. at 921 (quoting State v. Mathews, 4 Wn. App. 653, 658, 484 P.2d 942 (1971)). Not only did Ibarra-Erives admit to living in room KK, he also possessed in his pockets paraphernalia used to smoke methamphetamine and an amount of cash that a detective testified was consistent with drug sales. And, unlike Callahan, Ibarra-Erives' ties to the apartment exceeded that of an overnight guest. He lived in the unit at the time

---

[4] State v. Spruell, 57 Wn. App. 383, 388, 788 P.2d 21 (1990), also relied on by Ibarra-Erives, reached the same conclusion because the evidence showed the defendant "had no connection with the house or the cocaine" other than as "a mere visitor in the house."

and slept in the bedroom where police found the backpack. Police also found a pile of his clothes and two bottles of prescription medication nearby that Ibarra-Erives admitted were his.

Considering the evidence in the light most favorable to the State, a rational trier of fact could determine that Ibarra-Erives constructively possessed the backpack and its contents.

<u>Prosecutorial Misconduct</u>

Ibarra-Erives claims the prosecutor engaged in race-based misconduct during closing argument by twice using the term "Mexican ounce" to describe the way the heroin in the backpack was packaged for sale. He argues the prosecutor used this gratuitous reference to connect him to the drugs, invoking "stereotypes of Mexican drug-dealing and dishonesty" against him.

A prosecutor's zealous pursuit of justice is not without boundaries. <u>See State v. Case</u>, 49 Wn.2d 66, 70-71, 298 P.2d 500 (1956). Prosecutors have a duty to the defendant to uphold their right to a fair trial. <u>State v. Monday</u>, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). Prosecutors commit misconduct when they use arguments designed to arouse the passions or prejudices of the jury. <u>In re Pers. Restraint of Glasmann</u>, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). These kinds of arguments create a danger that the jury may convict for reasons other than the evidence produced at trial. <u>State v. Ramos</u>, 164 Wn. App. 327, 338-39, 263 P.3d 1268 (2011) (citing <u>United States v. Solivan</u>, 937 F.2d 1146, 1153 (6th Cir. 1991)). " 'In cases where race should be irrelevant, racial considerations, in particular, can affect a juror's impartiality and must be removed

7

No. 82889-4-I/8

from courtroom proceedings to the fullest extent possible.' " Monday, 171 Wn.2d at 684 (Madsen, C.J., concurring) (quoting State v. Varner, 643 N.W.2d 298, 304 (Minn. 2002)). "Not all appeals to racial prejudice are blatant." Id. at 678. We must recognize that subtle references to racial bias are "just as insidious" and "[p]erhaps more effective." Id. "Like wolves in a sheep's clothing, a careful word here and there can trigger racial bias." Id.

Ibarra-Erives did not object to the prosecutor's comments at trial. To prevail on a claim of prosecutorial misconduct raised for the first time on appeal, a defendant must generally show improper conduct and prejudice as well as demonstrate that the prosecutor's actions were "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

But when the allegation is race-based misconduct, we apply a separate analysis. Monday, 171 Wn.2d at 680; State v. Zamora, 199 Wn.2d 698, 709, 512 P.3d 512 (2022).[5] We look to see whether the prosecutor " 'flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence.' " Zamora, 199 Wn.2d at 709 (quoting Monday, 171 Wn.2d at 680). We determine this by asking whether an objective observer could view the prosecutor's comments during closing argument as an appeal to the jury's potential prejudice, bias, or stereotypes. See Zamora, 199 Wn.2d at 718. In doing so, we consider the broader context, such

---

[5] "Unlike the rules for general prosecutorial misconduct, the rule for race-based prosecutorial misconduct does not differentiate between a defendant who objects and one who does not object." Zamora, 199 Wn.2d at 709 n.11.

as the frequency of improper comments, their intended purpose, the subject, and the type of case. State v. Loughbom, 196 Wn.2d 64, 75, 470 P.3d 499 (2020). When a prosecutor flagrantly or apparently intentionally appeals to a juror's potential racial or ethnic prejudice, bias, or stereotypes, the resulting prejudice is incurable and requires reversal. Zamora, 199 Wn.2d at 721 (modifying the constitutional harmless error standard announced in Monday).

This case involved allegations of constructive possession of methamphetamine and heroin. At issue was whether circumstantial evidence showed that Ibarra-Erives exercised dominion and control over the drugs in the backpack and whether he intended to sell them. In his direct testimony, the lead detective explained that 28 grams equals 1 ounce and that the heroin bindles found in the backpack each weighed 24.6 grams. He told the jury that when dealing with heroin, "25 grams is considered an ounce." He explained that "the term on the street is it's a Mexican ounce."

The prosecutor then repeated the term twice in closing argument. Once when addressing whether sufficient evidence connected Ibarra-Erives to the bedroom and the backpack:

> I think I would submit to you the most important room to focus on in this case is room KK. What do we know about room KK?
> Detectives spoke with Mr. Ibarra-Erives.
> Do you live here? Do you live at the place that we have gotten a search warrant to search for drugs?
> Yes. I have been living here. I live in room KK. Right? I sometimes also sleep on the couch in the living room. Do you recall that that was also the statement?
> The items in this room, do they belong to Mr. Leon Reynaga?
> If you recall that was the other individual that was found in the house, right?

No. 82889-4-I/10

> No. He was just visiting.
> Those are not the officers' statements. Those were the statements of the defendant to the officers.
> Does he have any items here?
> No.
> In — found in that room is five bindles of heroin worth $5,000, cut up to a Mexican ounce. If you will recall, that's about 25 ounces [sic] per bindle, right? Well over the amount in one bindle of what a user would carry around.

The prosecutor used the term again when discussing Ibarra-Erives' intent to sell the drugs:

> Even the amount of methamphetamine found in the kitchen was high for a user amount, if you will recall the testimony. Okay?
> Mexican ounce for the heroin. Full ounce for the methamphetamine.

The State argues the term was relevant because it was "probative of the fact that 25 grams of heroin, despite not being an ounce, is a sufficiently common amount for sale that it has its own terminology." The State is incorrect. Testimony that heroin is packaged in an amount commonly sold on the street is probative of an intent to sell the drugs. But the street term attributing that practice to a particular racial or ethnic group is not. And when the defendant appears to be a member of that same racial or ethnic group, such comments improperly suggest that he is more likely to have packaged or possessed the drugs.

At oral argument, the State explained that whether or not the term was relevant, the prosecutor acted in good faith and did not intend to use the term in a manner that would appeal to the prejudice of the jurors. But when determining whether a race-based comment was "apparently intentional," we consider whether an objective observer could view the prosecutor's comments during

10

No. 82889-4-I/11

closing argument as an appeal to the jury's potential prejudice. Zamora, 199 Wn.2d at 718. And here, an objective observer who is "aware of the history of race and ethnic discrimination in the United States and aware of implicit, institutional, and unconscious biases, in addition to purposeful discrimination"[6] against Latinx people, could view the prosecutor's use of the term as an apparently intentional appeal to jurors' potential bias—a suggestion that Ibarra-Erives was more likely to have possessed drugs packed to a "Mexican ounce" because he speaks Spanish and appears to be Latinx. Such a suggestion improperly undermines the presumption of innocence by urging the jury to rely on race-based suggestions rather than the evidence to connect Ibarra-Erives to the drugs in the backpack.

We reverse and remand.[7]

_____, J

WE CONCUR:

_____, J.        _____, J.

---

[6] Zamora, 199 Wn.2d at 718.

[7] Because we reverse and remand on prosecutorial misconduct grounds, we do not address Ibarra-Erives' argument that the trial court improperly excused a potential juror for cause. Nor need we address the trial court's imposition of supervision fees in the judgment and sentence.

11