# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49304-7-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| CARLOS A. LIMA, | |
| Appellant. | |

BJORGEN, C.J. — Carlos Lima appeals his conviction and sentences for second degree assault, second degree unlawful possession of a firearm, delivery in lieu of a controlled substance, maintaining premises or a vehicle for using controlled substances, and two counts of possession of a controlled substance.

Lima argues that (1) the State committed misconduct by attempting to elicit an impermissible opinion on guilt from a witness, (2) his two convictions for possession of a controlled substance violated double jeopardy, (3) the trial court erred by imposing a school zone sentencing enhancement on his sentence for delivery in lieu of a controlled substance, (4) the trial court erred by imposing sentences that exceeded the statutory maximum sentence for his second degree assault conviction, and (5) we should not impose appellate costs if the State prevails.

We hold that the State acted improperly by eliciting an opinion on guilt, but that misconduct did not prejudice Lima. We hold also that Lima's two convictions for possession of a controlled substance violated double jeopardy, the trial court erred by imposing a school zone sentencing enhancement, and the trial court erred by sentencing Lima in excess of the statutory maximum sentence for second degree assault. We also decline to impose appellate costs in this matter. Consequently, we strike one of Lima's convictions for possession of a controlled substance and we strike the school zone sentencing enhancement.

We affirm the remainder of Lima's convictions and remand for resentencing.

FACTS

On December 11, 2015, Maleisa Bennett met Lima to purchase heroin. When Bennett returned home, she discovered that the heroin Lima gave her was actually some sort of sugary substance, not heroin. After discovering the fake heroin, Bennett attempted to call Lima, but was unable to reach him. At about 2:00 a.m. that evening Bennett and her fiancé, Derrick Brasier, went to Lima's house.

After arriving at Lima's house, Bennett knocked on the door and window until Lima's wife, Nataly Lima,[1] opened the door. Bennett and Brasier went inside the home, and Bennett told Nataly that the heroin Lima gave her was fake and that she wanted either her money back or real heroin. Nataly responded that Lima was sleeping, she and Lima had spent the money Bennett gave them, and they did not have any heroin. Bennett then went to Lima's bedroom to try to wake him up and talk with him. Lima woke up, and both he and Bennett returned to the kitchen/living room area of his home.

---

[1] We refer to Carlos Lima's wife, Nataly, by her first name for clarity, and to Carlos as Lima. We intend no disrespect.

2

During this interaction, Lima attempted to walk past Brasier, who grabbed him and pinned him against a wall. Bennett testified that Brasier stopped Lima because he was worried that Lima was looking for a pistol and because Brasier wanted to de-escalate the situation. Once Brasier let go, Lima grabbed his pistol from the top of the refrigerator in the kitchen and fired a warning shot past Bennett and Brasier into the living room.

Bennett, Lima, and Brasier then exited the house into the alley. Once outside, Lima struck Brasier with his pistol on his head and fired another shot into the hillside on the other side of the alley. After Lima fired the second shot, Brasier attempted to grab Lima from behind, and in the ensuing struggle Brasier was shot once through the hip. Brasier fell to the ground, but did not immediately realize that he had been shot, and Lima ran back into the house.

After Lima ran inside, Bennett picked up a flower pot and threw it at Lima's car in the alley way, damaging the windshield. Brasier realized that he could not walk well and gave Bennett his car keys so that she could pick him up from the alley. After Bennett left the alley, Lima exited his home, got into his car, and drove at Brasier, who hit the car's hood and windshield before rolling off to the side of the car. Lima then drove out of the alley, sped down the street, and stopped behind a coffee shop and discarded his pistol.

After law enforcement officers arrived at Lima's house, Nataly told them that two males had come to their house demanding to speak to Lima and that she had never seen Lima with a gun. Officers located Lima later that night and placed him under arrest. After Lima learned that Brasier and Bennett had reported the incident, Lima agreed to show officers where he had discarded his pistol. Officers later searched Lima's home and found a small case containing heroin in the bedroom. The officers also discovered items with heroin residue on them in the car that Lima was driving when he was arrested.

3

The State's first amended information charged Lima with first degree assault, second degree assault,[2] second degree unlawful possession of a firearm, delivery in lieu of a controlled substance,[3] maintaining premises or a vehicle for using controlled substances, and two counts of possession of a controlled substance.

At trial, Lima called Nataly as a witness, who testified about her prior statements to law enforcement officers:

> [Defense]: All right. And do you recall talking to officers about this incident?
> [Nataly]: Yeah. But I didn't tell them any of the truth. I didn't want to – I didn't make any statement or anything. They asked me questions, like, if I knew anything about the gun and I said no. I was just – I didn't want to get Carlos in trouble, but he already told them where the gun was and everything.
> [Defense]: All right. So when you say you didn't make a statement, you're saying you did talk to them?
> [Nataly]: I talked to them, but –
> [Defense]: You're just saying that you didn't tell them everything you knew?
> [Nataly]: Um-hmm. Well, because they already talked to Carlos and they said that my statements are false and so I shouldn't be saying anything like that. And I said, just give me a ride home. I don't want to talk about it. That I don't want to write a statement or anything.

Verbatim Report of Proceedings (VRP) (July 7, 2016) at 853-54.

The State extensively cross-examined Nataly regarding her inconsistent versions of the incident and jail phone conversations between her and Lima:

> [Prosecutor]: Okay. So that was, I guess it's almost two weeks ago now. Right before the trial started, you came to my office and did an interview with me; right?
> [Nataly]: Yes.
> . . . .

---

[2] The parties appear to agree that the second degree assault charge related to Lima's shooting of Brasier in the alley.

[3] The delivery in lieu of controlled substance charge included a special allegation that the sale had taken place near a school, bus stop, or other protected zone.

[Prosecutor]: And so after that, you and I actually talked again this morning; right?

[Nataly]: Yes.

[Prosecutor]: And I interviewed you a little bit further?

[Nataly]: Yes.

. . . .

[Prosecutor]: And the information that you provided on these different occasions, they changed throughout the course of these interviews, didn't they?

[Nataly]: Yes.

[Prosecutor]: All right. And part of this is because you don't want to incriminate your husband?

[Nataly]: Yes.

. . . .

[Prosecutor]: Your husband was aware that you were going to be interviewed by me; right?

[Nataly]: Yes.

[Prosecutor]: And, in fact, as soon as we finished that interview, he called you to ask you about it, didn't he?

[Nataly]: Yes.

. . . .

[Prosecutor]: So you agree that your testimony today on the stand is different from what you told the detective the night that it happened; right?

[Nataly]: Yes.

[Prosecutor]: It's different than what you said in our first interview?

[Nataly]: Yes.

. . . .

[Prosecutor]: And it's true that through the course of this trial, you haven't been in the courtroom with us until now; right?

[Nataly]: Yes.

[Prosecutor]: But every day after court last week your husband called you after court, didn't he?

[Nataly]: Yes.

[Prosecutor]: And he told you what every single one of my witnesses had said?

[Nataly]: Not a whole lot. He didn't want to get in trouble for telling me too much.

[Prosecutor]: That actually – he didn't – once he heard about the fact that I was reviewing his phone calls, then he didn't want to get in trouble about what he said, and he was more careful about what he told you this week; right?

[Nataly]: Yes.

. . . .

[Prosecutor]: So over the course of – from last Monday until today, you realized that you were going to get caught up in the lies that you had told me in your interview. And so you changed your position and you have different testimony today?

[Nataly]: Yes. Which is all the truth.

. . . .

[Prosecutor]: And we went through some of the jail calls, things that you've discussed with your husband and your discussions regarding your testimony. And you agree that since you were originally contacted by Detective Heffernan, up until today, your story has had some changes?

[Nataly]: Yes.

[Prosecutor]: And in part that's due to your discussion with your husband?

[Nataly]: I mean a little bit, yes.

VRP (July 7, 2016) at 862-66, 892-93.

The prosecutor also questioned Nataly about possible results:

[Prosecutor]: Okay. Just one last thing – when you were talking to your husband this past week, you guys talked obviously about this case and what was going on, but you also talked about what he was charged with?

[Nataly]: Yes.

[Prosecutor]: And you guys had some – a conversation about what he might be convicted of?

[Nataly]: Yes.

[Prosecutor]: Because he's charged with multiple charges?

[Nataly]: Yes.

[Prosecutor]: And you discussed some possible outcomes of the situation?

[Nataly]: Yes.

[Prosecutor]: And isn't it true that you told your husband, *"Yeah, but I think they're still* [*going to*] *find – f—king – they're still* [*going to*] *– I think* [*the*] *assault will still hold up though"*?

[Defense]: Your Honor, I'm objecting to that.

VRP (July 7, 2016) at 895-96 (emphasis added).

After the jury left the courtroom, the trial court had a colloquy with the attorneys and sustained the objection on the grounds that the question called for an improper opinion on guilt and went beyond the scope of proper impeachment. During the colloquy, Lima argued that the State's question had the effect of "asking [Nataly] to convey her belief as to whether the defendant is guilty or innocent." VRP (July 7, 2016) at 896. Lima did not ask the court to issue a curative instruction or otherwise instruct the jury to disregard the question, and the trial court took no such action.

In closing, the State argued that the heroin found in Lima's bedroom and in the car supported two distinct counts of possession of a controlled substance, contending that Lima had dominion and control over each.

The jury found Lima not guilty of first degree assault and guilty of second degree assault, second degree unlawful possession of a firearm, delivery in lieu of a controlled substance, maintaining premises or a vehicle for using controlled substances, and both counts of possession of a controlled substance. The trial court imposed a 24 month school zone enhancement on Lima's conviction for delivery in lieu of a controlled substance. The court also sentenced Lima to 106 months' confinement with an additional 18 months of community custody supervision, for a total sentence of 124 months on the assault conviction. Lima appeals his convictions and sentence.

## ANALYSIS

### I. PROSECUTORIAL MISCONDUCT—OPINION ON GUILT

Lima argues that the State committed misconduct by attempting to elicit an impermissible opinion on guilt from a witness. We disagree.

A.    <u>Standards</u>

To establish a claim of prosecutorial misconduct, Lima must demonstrate that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). To establish prejudice, there must be a substantial likelihood that the misconduct affected the jury verdict. *Id*. Although Lima objected to the State's questioning, he did not move to strike the question or seek a curative instruction. "[A]bsent any request for a mistrial or curative instruction, we will not reverse unless the prosecutor's conduct was so prejudicial that

no curative instruction could have obviated the prejudice." *State v. Israel*, 113 Wn. App. 243, 289, 54 P.3d 1218 (2002).[4] We review allegedly improper arguments in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given. *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994).

B.      Impropriety

In general, a witness may not testify regarding the guilt or veracity of the defendant, because to do so would unfairly prejudice the defendant and usurp the function of the jury. *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001). However, a lay witness may offer opinions or inferences that are: (1) based on rational perceptions, (2) helpful to the jury, and (3) not based on scientific or specialized knowledge. *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). For example, a witness may properly offer an opinion on the speed of a vehicle, relative sobriety in a driving while intoxicated case, the value of one's own property, or the identification of a person from a video tape. *State v. Farr-Lenzini*, 93 Wn. App. 453, 462, 970 P.2d 313 (1999). In contrast, a witness may not opine on another person's mental capacity for the purpose of entering into a lease or whether a person's capacity was diminished absent knowledge of whether the individual was on drugs. *Id.* In *Farr-Lenzini*, we held that a police officer's statement that the defendant "was attempting to get away from [him] and knew [he] was back there and [was] refusing to stop," was an impermissible opinion because the officer had insufficient factual information to speculate about the defendant's state of mind. *Id.* at 463-65.

---

[4] The State argues that Lima's error was not preserved in the trial court and that he must demonstrate a "manifest error affecting a constitutional right," under RAP 2.5(3) to obtain review. Br. of Resp't at 14. However, Lima's attorney objected to the improper conduct at trial and explained the basis for his objection. Therefore, although Lima did not ask the trial court to strike the State's question, he has preserved review of that question for appeal.

In this case, the State asked Nataly if she had told Lima, "Yeah, but I think they're still [going to] find . . . they're still [going to] – I think [the] assault will still hold up though." VRP (July 7, 2016) at 896. Although the State argues that this question was permissible opinion testimony because Nataly witnessed the incident, the question calls for a legal conclusion and does not offer any factual basis that would help the jury in its deliberations. The State also contends that "the question asked was not a 'direct comment' on guilt," but rather "alluded to [Nataly's] assessment of the strength of the [S]tate's case on the assault count." Br. of Resp't at 18. However, the purpose of the State's case is to demonstrate that Lima was guilty of the charged assault. The prosecutor's question posited Nataly as saying, "I think the assault will still hold up though," as part of a discussion of what he might be convicted of. VRP (July 7, 2016) at 896. Thus, the prosecutor's question communicated Nataly's opinion on guilt as much as it communicated her assessment of the State's case. Further, that this assertion took the form of the prosecutor's question instead of Nataly's answer does not change its character as an opinion on guilt. *State v. Jungers*, 125 Wn. App. 895, 901, 106 P.3d 827 (2005). Therefore, despite the State's attempt to characterize the question as benign, we hold that the State's question to Nataly was patently improper.

C.    Prejudice

Even though Lima testified that the gun fired accidentally, we are not persuaded that there is a substantial likelihood that the State's improper remark affected the jury verdict. First, Brasier testified that Lima deliberately placed the gun on his hip and shot him. Second, the improper statement by the prosecutor was ambiguous. It could just as easily have been taken as a case assessment or prediction of conviction, rather than an opinion that Lima was in fact guilty. Third, it is unlikely that a rational juror would have found Nataly's testimony credible after she

admitted to repeatedly lying to law enforcement to avoid incriminating Lima and altering her testimony based on phone calls with Lima regarding the testimony of the State's witnesses. Finally, the State's impeachment of Nataly also damaged Lima's credibility in that Nataly testified that the changes in her story were in part due to her conversations with Lima.

Although Lima's testimony did contradict Brasier's, we believe, for the reasons just given, that Lima has not demonstrated a substantial likelihood that the improper question by the prosecutor affected the jury verdict. Thus, Lima has not demonstrated the needed prejudice, and his claim of prosecutorial misconduct fails.

## II. DOUBLE JEOPARDY—UNIT OF PROSECUTION

Lima argues that his two counts of possession of a controlled substance constituted a single unit of prosecution and that his two convictions on the basis of a single unit of prosecution violated the double jeopardy clause of the state and federal constitutions. We agree.

We review double jeopardy claims de novo. *State v. Barbee*, 187 Wn.2d 375, 382, 386 P.3d 729 (2017). Among other situations, double jeopardy is violated when a person is convicted multiple times for the same offense. *Id*. at 382. When a person is convicted multiple times under the same statute, we must consider what "unit of prosecution" the legislature intended as the punishable act under the specific criminal statute. *Id*. at 382. Therefore, questions regarding the appropriate unit of prosecution present issues of statutory interpretation and legislative intent. *Id*. at 382. We also examine the facts of a particular case, because they may indicate that more than a single unit of prosecution is present based on the circumstances. *State v. Bobic*, 140 Wn.2d 250, 266, 996 P.2d 610 (2000). If the legislature did not include a unit of prosecution or if its intent is ambiguous, we apply the rule of lenity, which "requires any

ambiguity be resolved against turning a single transaction into multiple offenses." *Barbee*, 187 Wn.2d at 383.

In *State v. Adel*, our Supreme Court determined the appropriate unit of prosecution for possession of marijuana. 136 Wn.2d 629, 965 P.2d 1072 (1998). In that case, Adel was charged with two counts of possession of marijuana based on marijuana discovered in the defendant's store and car parked outside. *Id*. at 631. He was convicted of both counts under RCW 69.50.401(e), which stated, "[A]ny person found guilty of possession of forty grams or less of mari[j]uana shall be guilty of a misdemeanor." *Id*. at 635. The court determined that the statute "fail[ed] to indicate whether the Legislature intended to punish a person multiple times for simple possession based upon the drug being stashed in multiple places," which "favors applying the rule of lenity." *Id*. at 635. The court also observed:

> All of the drugs found in this case were within Adel's dominion and control at the same time. The possession statute does not authorize multiple convictions based upon a drug being stashed in multiple places within a defendant's actual or constructive possession.

*Id*. at 636. The court held that the "unit of prosecution in RCW 69.50.401(e) is possessing 40 grams of marijuana or less, regardless of where or in how many locations the drug is kept." *Id*. at 637.

Lima was convicted of two counts of possession of a controlled substance under former RCW 69.50.4013 (2015):

> (1) It is unlawful for any person to possess a controlled substance unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of his or her professional practice, or except as otherwise authorized by this chapter.

Heroin is a schedule I controlled substance. RCW 69.50.204(b)(11). Like the statute considered in *Adel*, former RCW 69.50.4013 does not clearly indicate whether the legislature

intended to punish a person multiple times for possession simply because a drug is kept in multiple places. Also similar to *Adel*, the only factor distinguishing Lima's two possession counts was the location where the drugs were found, the bedroom and Lima's car. Further, the locations in which Lima's drugs were found are analogous to those in *Adel*. Lima's drugs were found in his house and in his car parked outside. Adel's were found in his store and in his car parked outside. Finally, the State argued, contrary to *Adel*, that the jury could convict Lima on two counts of possession if it determined that he had dominion and control over both the car and his home.

Therefore, following *Adel*, we hold that former RCW 69.50.4013 is ambiguous and that the rule of lenity and the policy reasons articulated in *Adel* support interpreting the statute's unit of prosecution in these circumstances as actual or constructive possession, which would include Lima's house and car. Consequently, Lima's two convictions for possession of heroin based on a single unit of prosecution violated double jeopardy, and we strike one of Lima's possession convictions.

### III. SCHOOL ZONE SENTENCING ENHANCEMENT

Lima argues that the trial court exceeded its authority by imposing a school zone sentencing enhancement on his conviction for delivery in lieu of a controlled substance, RCW 69.50.4012. The State concedes that the school zone enhancement statute, RCW 69.50.435, does not authorize such an enhancement for a violation of RCW 69.50.4012. By its plain language, an enhancement under RCW 69.50.435 applies only to a person who violates RCW 69.50.401 or RCW 69.50.410, but does not apply to RCW 69.50.4012. Therefore, we accept the State's concession and reverse Lima's 24 month school zone sentencing enhancement for delivery in lieu of a controlled substance.

## IV. SECOND DEGREE ASSAULT SENTENCE

Lima contends that his sentence including community custody exceeds the statutory maximum for his second degree assault conviction. The State concedes that Lima's 124 month sentence exceeds the 120 month statutory maximum sentence for second degree assault. RCW 9A.36.021(2); RCW 9A.20.020(1)(b); former RCW 9.94A.533(3)(g) (2015). The State is correct.

A trial court errs "when it impos[es] a term of confinement plus a term of community custody exceeding the statutory maximum." *State v. Hernandez*, 185 Wn. App. 680, 688, 342 P.3d 820 (2015), *review denied*, 185 Wn.2d 1002 (2016). In *State v. Boyd*, our Supreme Court reasoned that "the trial court, not the Department of Corrections, [is] required to reduce [the defendant]'s term of community custody to avoid a sentence in excess of the statutory maximum." 174 Wn.2d 470, 473, 275 P.3d 321 (2012). Therefore, we accept the State's concession and remand this case to the trial court to reduce the term of community custody so that the combined term of confinement and community custody does not exceed the statutory maximum.

## V. APPELLATE COSTS

Lima requests that we decline to impose appellate costs should the State prevail on appeal. In its briefing, the State disclaimed any intention to seeks costs on appeal should it prevail. Therefore, we decline to impose appellate costs.

## CONCLUSION

We reverse one of Lima's convictions for possession of a controlled substance and we reverse the school zone sentencing enhancement. We affirm his remaining convictions, decline

to impose appellate costs, and remand for resentencing.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, J.

We concur:

Worswick, J.

Maxa, C.J.