IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81046-4-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| WILLIAM LEWIS RICHARD, | ) | |
| Appellant. | ) | |

SMITH, J. — William Richard appeals his conviction for child molestation in the first degree. He contends that the prosecutor committed reversible misconduct while cross-examining Richard and during closing. He also contends that the trial court erred by imposing an unconstitutionally vague community custody condition and by imposing discretionary legal financial obligations (LFOs) despite Richard's indigence. We affirm Richard's conviction and the challenged community custody condition. We accept the State's concession that the trial court erred inasmuch as it ordered interest to accrue on nonrestitution LFOs. And we hold that because Richard is indigent, it was an abuse of discretion to order him to pay discretionary LFOs. Therefore, we remand to the trial court to (1) modify the judgment and sentence to clarify that interest accrual applies only to nonrestitution LFOs and (2) strike the provisions ordering Richard to pay collection costs and Department of Corrections (DOC) supervision fees.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

In 2018, the State charged Richard by amended information with one count of child molestation in the first degree for having sexual contact with his stepdaughter, A.R. At Richard's trial, Courtney Richard, Richard's ex-wife and A.R.'s mother, testified that on October 16, 2016, when she was still married to Richard, she received a phone call from a friend. The friend revealed on the call that her boyfriend had admitted to touching the friend's daughter, J., in a sexual way. Courtney[1] testified that after her conversation with her friend, she and Richard were getting ready for bed but decided they wanted something to eat, so Richard went to McDonald's to get a snack. Courtney testified that while Richard was out, A.R. said to her, "'Mom, I left something for you to see in the bathroom.'" Courtney responded that she had not seen it, but when she and A.R. went into the bathroom, she saw that A.R. had left her journal on the counter. A.R. had written in the journal, "'This is private information. Dad made me touch his private when I was like 7. I was scared to tell you, but now I'm not scared.'" A.R. later testified that she had overheard the call between Courtney and her friend and that she "heard that [the friend]'s daughter [J.] -- something had happened to her with her dad." A.R. testified that "[J.] was brave enough to tell her mom, so I got brave and I thought that I would be able to tell my mom because . . . she did."

Courtney recalled feeling shocked when she saw the journal. She testified that she and A.R. went into A.R.'s room, and Courtney started asking A.R., "'Are

---

[1] Because Courtney Richard and William Richard share a last name, we refer to Courtney Richard by her first name for clarity.

you sure that this happened?'" Courtney explained that she "was making sure that it was [Richard] that [A.R.] was talking about" and that A.R. "probably knew about [Courtney's friend]'s situation, so [Courtney] . . . wanted to make sure that this was something that came from [A.R.] that happened to her." Courtney testified that when she asked A.R. if she was sure that this happened, A.R. responded yes.

Richard, who later testified in his own defense, recalled that when he returned from McDonald's, he found Courtney in A.R.'s room with A.R. Courtney was sitting on the bed with A.R., who was crying, so Richard asked what was wrong. A.R. responded that she had had a bad dream. Richard testified that he told A.R. that "if she has any problems sleeping that she can come in with her mom and [me]," and that he then gave A.R. a hug and went into his and Courtney's room to wait for Courtney.

Richard recalled that less than a minute later, "Courtney came in the room and told me that [A.R.] said I was inappropriate." Richard responded, "'I don't know what [A.R.]'s talking about.'" He testified that he and Courtney then had a conversation in which Courtney said, "'[A.R.] said that you had her touch [you]'" and he responded, "'There's no way.'" Richard described Courtney as angry and recalled that Courtney said she was "taking the girls and leaving." Courtney testified that she left with A.R. and A.R.'s younger sister that night, and they went to Courtney's sister's place.

Courtney testified that she continued to communicate with Richard that night, through text messages. She testified that she "just kept asking him: Did he

do this? Why did he do it? What's wrong with him?" She estimated that she and Richard kept text messaging "[m]aybe for a couple of hours that night" and that the text messages continued the next day. She also testified, "[Richard] admitted to doing it over the text messages. He said he didn't know why he did it. He said he didn't know what was wrong with him. He said he needed help." Courtney later provided screenshots of some of the text messages to the police. She testified that she did not provide every text message that was sent between the two of them; she picked the text messages in which Richard implicated himself. These messages were admitted at trial but are not part of the record on appeal.

Richard also testified, on direct, that the text messages admitted at trial were only some of the messages that he and Courtney exchanged the night of October 16, 2016, and the next morning. He estimated that during that time, he received "[p]robably a hundred or more" text messages from Courtney. He testified that when Courtney started making accusations, he responded no. But he acknowledged that in some of the messages he said that "maybe some things had happened." He explained, however, that he was not sending those texts because they were true, but because he "was telling [Courtney] what she wanted to hear to leave [him] alone."

On cross-examination, the prosecutor questioned Richard as to whether Richard had saved the text messages he received from Courtney, and Richard's counsel twice objected:

> Q      Is it your testimony that you didn't think – you weren't sure whether or not this would become a police matter on October 16th, 2016?

A    I wasn't sure where the evening was going.  It was very brief.

Q    But on October 17th you knew it was probably going to be a police matter, right?

A    Yes.

Q    You didn't start saving a bunch of hundreds of text messages, right?

      [DEFENSE COUNSEL]:  Objection.  Burden shifting, Your Honor.

      [PROSECUTOR]:  It's not burden shifting.  It responds exactly to his direct.

      THE COURT:  The question is did he start saving text messages.  That is not burden shifting, but don't go there.

      [PROSECUTOR]:  And I'm not.

Q    You didn't start on October 17th saving and screenshotting those hundreds of text messages that you just claimed, correct?

A    I actually did have screenshots of those that I do not have anymore.

Q    What happened to those?

A    They were in my storage unit, and I lost it.

Q    When did you lose the storage unit?

A    Last fall, I believe.

Q    So in the fall of 2017?

A    Yes.

Q    In what format were they?

A    They were screenshot and printed out.

Q    They were printed out?

A      Yes.

Q      Did you print them directly from the phone?

A      Yes.

Q      And when did you print them?

[DEFENSE COUNSEL]:  Your Honor, same objection. I don't see how it's not burden shifting.

THE COURT:  I think you better stop there.

On further cross-examination, the prosecutor asked Richard, "What were the words that made you falsely confess to having [A.R.] touch [you]?"  Richard responded that he could not remember the exact words and that it was "several texts and phone calls."  He testified that the "gist" of the words was, "If [Courtney's friend's boyfriend] can be man enough to own up, then why can't you," and "You're never going [to] see your kids again.  You're going to lose everything."  Additionally, when pressed by the prosecutor, Richard testified that from the time that Courtney left with A.R. and her sister until 9:00 the following morning, he received more than 30 text messages but probably not as many as 60.

During closing argument, the prosecutor referred back to Richard's testimony regarding the text messages, and defense counsel raised an objection:

[PROSECUTOR]:  That's unreasonable.  It doesn't create reasonable doubt.  It's unreasonable for him to claim that 30 to 60 text messages were sent in that one night but that they conveniently went missing along with the phone and –

[DEFENSE COUNSEL]:  Objection.  Burden shifting, Your Honor.

THE COURT:  The testimony –

6

[DEFENSE COUNSEL]: That they occurred –

THE COURT: It is clear that the State bears the burden of proof . . . . The Defendant has no duty to prove anything. This is a recapitulation of the way the State sees the evidence. . . .

[PROSECUTOR]: Thank you, Your Honor. And I'll reaffirm that.

The jury convicted Richard as charged. Richard appeals. Additional facts related to the sentencing issues Richard raises on appeal are set forth below in the analysis of those issues.

ANALYSIS

*Prosecutorial Misconduct*

Richard contends that "[t]he prosecutor committed misconduct when he (1) suggested in cross-examining Richard that he had a duty to produce Courtney's numerous texts that badgered him into making a false confession and (2) argued in closing that Richard's failure to do so reflected upon his guilt." We disagree.

Prejudicial prosecutorial misconduct deprives a defendant of his guaranty to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). To prevail on a claim of prosecutorial misconduct, the defendant bears the burden of showing "that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." Glasmann, 175 Wn.2d at 704; State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). We

7

review allegations of prosecutorial misconduct for abuse of discretion. Lindsay, 180 Wn.2d at 430.

A prosecutor commits misconduct when he argues that the burden of proof rests with the defendant, and "[a] prosecutor generally cannot comment on the defendant's failure to present evidence because the defendant has no duty to present evidence." State v. Thorgerson, 172 Wn.2d 438, 453, 258 P.3d 43 (2011). This does not mean, however, that if a defendant chooses to testify, the prosecutor must refrain from attacking the defendant's testimony. "'On the contrary, the evidence supporting a defendant's theory of the case is subject to the same searching examination as the State's evidence.'" State v. Cardenas-Flores, 194 Wn. App. 496, 516, 374 P.3d 1217 (2016) (quoting State v. Contreras, 57 Wn. App. 471, 476, 788 P.2d 1114 (1990)), aff'd, 189 Wn.2d 243, 401 P.3d 19 (2017). Additionally, in closing argument, "[a] prosecutor is entitled to argue inferences from the evidence and to point out improbabilities or a lack of evidentiary support for the defense's theory of the case." State v. Killingsworth, 166 Wn. App. 283, 291-92, 269 P.3d 1064 (2012).

Here, Richard fails to establish that the prosecutor's conduct was improper in light of these standards. Specifically, part of Richard's defense theory was that he only admitted to having inappropriate contact with A.R. so that Courtney would leave him alone. In support of this theory, Richard initially testified on direct that he received "[p]robably a hundred or more" texts from Courtney on the night of A.R.'s disclosure and the next morning. He also suggested in his testimony that the texts amounted to harassment. In short, Richard testified that

Courtney coerced him into making a false confession.

Richard's testimony in this regard opened the door to a "searching examination" of the evidence supporting Richard's coercion theory. See Contreras, 57 Wn. App. at 476. Because Richard testified on direct that Courtney's texts coerced him into making a false confession, the prosecutor did not commit misconduct by cross-examining Richard in a manner designed to suggest that the texts were not as numerous or coercive as Richard suggested and that if they had been, he would have preserved them given that he knew the police would be involved. The prosecutor's inquiry was a proper means of impeaching Richard's testimony, challenging his theory of the case, and attacking his credibility as a witness. It did not have the effect of shifting the burden of proof to Richard on any element of the offense of child molestation.

The prosecutor's comments during closing also did not shift the burden to Richard. The prosecutor argued, before defense counsel objected, "That's unreasonable. It doesn't create reasonable doubt. It's unreasonable for [Richard] to claim that 30 to 60 text messages were sent in that one night but that they conveniently went missing along with the phone." This argument did not imply that the jury could acquit Richard only if it believed his characterization of the text messages or, as Richard contends, suggest that his failure to produce the messages reflected on his guilt. Cf. State v. Anderson, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009) ("A prosecutor may commit misconduct . . . if the prosecutor states that the jury should find the defendant guilty *simply because he did not present evidence to support his defense theory*." (emphasis added));

9

Glasmann, 175 Wn.2d at 714 (holding that prosecutor committed misconduct by informing the jury "that acquittal was appropriate only if the jury believed [the defendant]"). Rather, it is clear from the context of the prosecutor's closing argument that he was asserting, based on reasonable inferences from the evidence, that Richard's theory that he was coerced into confessing was simply implausible and, thus, not a basis for finding reasonable doubt.[2]

In short, Richard has not satisfied his burden to demonstrate on appeal that the prosecutor's conduct was improper. Therefore, his prosecutorial misconduct argument fails, and we do not address whether the prosecutor's conduct was prejudicial. See State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) ("The defendant bears the burden of showing both prongs of prosecutorial misconduct.").

*Community Custody Condition*

At sentencing, the trial court imposed a community custody condition

---

[2] Richard argues, and the State concedes, that this is not a "missing witness" case. "The missing witness doctrine permits the jury to infer that evidence or testimony would be unfavorable to a party if that 'evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it' and that party fails to do so." State v. Houser, 196 Wn. App. 486, 491, 386 P.3d 1113 (2016) (internal quotation marks omitted) (quoting State v. Sundberg, 185 Wn.2d 147, 153, 370 P.3d 1 (2016)). When the missing witness doctrine applies, the prosecutor may emphasize the inference in closing argument. See State v. Gregory, 158 Wn.2d 759, 845, 147 P.3d 1201 (2006), overruled on other grounds by State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014). We agree with the State that taken in context, the prosecutor's arguments focused on the lack of evidentiary support for Richard's coercion theory and did not ask the jury to infer that any additional text messages would have been unfavorable to Richard. Therefore, and although the prosecutor wandered perilously close to the line by stating that the text messages "conveniently went missing," we agree with the parties that this is not a missing witness case and do not rely on that doctrine to reach our conclusion.

requiring Richard to stay out of areas where children's activities occur. Richard contends that remand is required to strike or modify this condition. We disagree.

"Conditions of community custody may be challenged for the first time on appeal and, where the challenge involves a legal question that can be resolved on the existing record, preenforcement." State v. Wallmuller, 194 Wn.2d 234, 238, 449 P.3d 619 (2019). We review community custody conditions for abuse of discretion. Wallmuller, 194 Wn.2d at 238. "A trial court necessarily abuses its discretion if it imposes an unconstitutional community custody condition, and we review constitutional questions de novo." Wallmuller, 194 Wn.2d at 238.

Under both the United States and Washington Constitutions, a community custody condition is vague and violates due process if "'(1) it does not sufficiently define the proscribed conduct so an ordinary person can understand the prohibition or (2) it does not provide sufficiently ascertainable standards to protect against arbitrary enforcement.'" Wallmuller, 194 Wn.2d at 238-39 (quoting State v. Padilla, 190 Wn.2d 672, 677, 416 P.3d 712 (2018)). "'[A] . . . condition is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct.'" Wallmuller, 194 Wn.2d at 239 (internal quotation marks omitted) (alterations in original) (quoting Padilla, 190 Wn.2d at 677). Instead, what is required by the state and federal constitutions is that "'citizens have fair warning of proscribed conduct.'" Wallmuller, 194 Wn.2d at 239 (internal quotation marks omitted) (quoting State v. Sanchez Valencia, 169 Wn.2d 782, 791, 239 P.3d 1059 (2010)). "That standard is satisfied where 'ordinary people

11

can understand what is and is not allowed, and are protected against arbitrary enforcement.'" Wallmuller, 194 Wn.2d at 239 (quoting Sanchez Valencia, 169 Wn.2d at 791).

Here, the community custody condition at issue requires Richard to

[s]tay out of areas where children's activities regularly occur or are occurring. This includes parks used for youth activities, schools, daycare facilities, playgrounds, wading pools, swimming pools being used for youth activities, play areas (indoor or outdoor), sports fields being used for youth sports, arcades, *and any specific location identified in advance by DOC or* [*the Community Corrections Officer (CCO)*].

(Emphasis added.) Richard first contends that the above-emphasized language in the condition constitutes an "open-ended caveat" that exposes him "to arbitrary enforcement by DOC or his CCO." He relies on State v. Irwin, 191 Wn. App. 644, 364 P.3d 830 (2015), to support his contention, but that reliance is misplaced.

In Irwin, we remanded to strike a community custody condition requiring the defendant-appellant not to "'frequent areas where minor children are known to congregate, *as defined by the supervising . . . CCO.*'" 191 Wn. App. at 649, 655 (emphasis added). But the condition in Irwin did not contain an illustrative list of prohibited areas and instead left the definition of prohibited areas to the sole discretion of the CCO. See Irwin, 191 Wn. App. at 654-55. Here, by contrast, the language of the condition provides DOC and the CCO with an illustrative list of prohibited areas, thus limiting their discretion to designate locations to avoid. Furthermore, the condition makes clear that DOC or the CCO must designate such locations in advance, thereby eliminating the risk that

12

Richard will inadvertently violate the condition. For these reasons, we conclude that the condition satisfies principles of due process and is not unconstitutionally vague.

Richard next contends that the condition is unconstitutionally vague because the list provided in the condition is not exhaustive. But in Wallmuller, our Supreme Court rejected the notion that a list must be exhaustive to satisfy due process. 194 Wn.2d at 245. Accordingly, Richard's contention fails.

*LFOs*

At sentencing, the trial court ordered Richard to pay collection costs and DOC supervision fees. Richard contends that remand is required to strike these LFOs from his judgment and sentence. He also contends that remand is required to modify or strike a provision of the judgment and sentence stating that interest will accrue on all LFOs. As further discussed below, we agree that remand is required to modify the interest accrual provision to reflect recent changes in the law. We also hold that because Richard is indigent, the trial court abused its discretion by ordering him to pay collection costs and by not waiving DOC supervision fees.

As an initial matter, the State asserts that Richard's LFO-related challenges were not preserved for appeal because he failed to raise them below. But in the wake of our Supreme Court's decision in State v. Blazina, 182 Wn.2d 827, 344 P.3d 680 (2015), "appellate courts have heeded its message and regularly exercise their discretion to reach the merits of unpreserved LFO arguments." State v. Glover, 4 Wn. App. 2d 690, 693, 423 P.3d 290 (2018). We

13

exercise that discretion here and reach the merits of Richard's LFO arguments.

Here, the trial court's judgment and sentence entered on July 13, 2018, provides that "[t]he financial obligations imposed in this judgment shall bear interest from the date of the judgment until payment in full, at the rate applicable to civil judgments." In other words, the judgment and sentence imposes interest accrual on *all* LFOs, whether or not consisting of restitution. We accept the State's concession that remand is required to modify this provision to reflect recent changes in the law prohibiting interest accrual on nonrestitution LFOs. See RCW 10.82.090(1) ("As of June 7, 2018, no interest shall accrue on nonrestitution legal financial obligations."). The modification proposed by the State in its response brief would be acceptable.[3]

We turn next to the trial court's imposition of collection costs and DOC supervision fees. Both of these LFOs are discretionary. Specifically, under RCW 36.18.190, "[t]he superior court *may*, at sentencing or at any time within ten years, assess as court costs the moneys paid for remuneration for services or charges paid to collection agencies or for collection services." (Emphasis added.) And under RCW 9.94A.703(2)(d), the trial court may waive DOC supervision fees. Cf. State v. Lundstrom, 6 Wn. App. 2d 388, 396 n.3, 429 P.3d 1116 (2018) (DOC supervision fees are discretionary LFOs), review denied, 193 Wn.2d 1007 (2019). We review the imposition of discretionary LFOs for abuse of

---

[3] The State proposed that the language in the judgment and sentence be modified to state, "'The restitution obligations imposed in this judgment shall bear interest from the date of the judgment until payment in full, at the rate applicable to civil judgments. No interest shall accrue on non-restitution obligations imposed in this judgment. RCW 10.82.090.'"

discretion. State v. Clark, 191 Wn. App. 369, 372, 362 P.3d 309 (2015).

"Discretion is abused when it is exercised on untenable grounds or for untenable

reasons." Clark, 191 Wn. App. at 372.

Here, the trial court found Richard indigent. And as our Supreme Court

observed in Blazina, the imposition of LFOs on indigent defendants presents

significant, often insurmountable, barriers to successful reentry and increases the

chances of recidivism. See Blazina, 182 Wn.2d at 835-37. Nevertheless, and

notwithstanding these well-documented barriers, the trial court here ordered

Richard to pay collection costs and DOC supervision fees. We can discern no

tenable basis for this decision and thus hold that it was an abuse of discretion.

The State points out that collection costs and DOC supervision fees are

not "costs" under RCW 10.01.160(3), which provides that "[t]he court shall not

order a defendant to pay costs if the defendant at the time of sentencing is

indigent." But assuming, *arguendo*, that collection costs and DOC supervision

fees are not costs within the meaning of that statute, they nonetheless constitute

discretionary LFOs. And as Division Three recently observed, "LFOs . . . should

not be imposed lightly merely because the legislature has not dictated that

judges conduct the same inquiry required for discretionary costs." Clark, 191

Wn. App. at 376. To that end, although the discretionary LFOs at issue in

Blazina consisted of costs, the Blazina court's discussion of the "problems

associated with LFOs imposed against indigent defendants" was not limited to

costs. 182 Wn.2d at 835. In short, the fact that collection costs and DOC

supervision fees may not be "costs" within the meaning of RCW 10.01.160(3)

15

does not persuade us that ordering an indigent defendant to pay them is a reasonable exercise of discretion.

The State next contends that collection costs should not be stricken because the clerk's office is independently authorized to send a case to collections and impose collection costs. But the issue before this court is not whether the clerk may, at some point in the future, send Richard to collections and order him to pay collection costs.[4] Rather, the only issue before us is whether the *trial court* properly exercised *its* discretion in ordering Richard to pay collection costs. And as discussed, the trial court did not. Therefore, Richard's contention fails.

We affirm Richard's conviction but remand to the trial court to (1) modify the interest accrual provision of the judgment and sentence to state that interest accrual does not apply to nonrestitution LFOs and (2) strike the provisions of the judgment and sentence ordering Richard to pay collection costs and DOC supervision fees.

_Smith, J._

WE CONCUR:

_Bruman, J_        _Appelwick, J._

---

[4] This opinion in no way limits the clerk's authority to impose costs as permitted by statute.