IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>    Respondent,<br><br>    v.<br><br>STEVEN EDWARD SHANNON, JR,<br><br>    Appellant. | No. 80576-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUN, J. — A jury found Steven Edward Shannon, Jr. guilty of assault in the first degree while armed with a firearm. Shannon contends for the first time on appeal that the trial court violated his state and federal constitutional rights to cross-examine and present a defense and that it violated his right against self-incrimination. He also claims he received ineffective assistance of counsel, the State engaged in prosecutorial misconduct, and the cumulative effect of the claimed errors denied him a fair trial. For the reasons discussed below, we affirm.

## I.    BACKGROUND

Around 12:30 a.m. on Sunday, February 4, 2018, Ian McKnight, a white male, and his friends Mack McClinton, Richard Durant, Scott Howell, and Loren[1] went to J.P.'s Barroom in Renton, Washington. McKnight went to the back of J.P.'s to play a video game. Durant accompanied McKnight because it was late

---

[1] The record lacks Loren's last name. He left J.P.'s before the incident and did not testify at trial.

Citations and pin cites are based on the Westlaw online version of the cited material.

and he felt the people in the back of the bar were "not the type of people I'd want to hang around."

Also around 12:30 a.m., Shannon, a black male, his friend Tiffany Dejohnette, and four other friends[2] met at J.P.'s to "relax a little bit," "play darts," and "have a few drinks." Shannon and Dejohnette sat at a table in the back.

Around 1:00 a.m., McKnight sat down at Shannon and Dejohnette's table. McKnight told them that they looked "sinister." Dejohnette thought McKnight was trying to "start trouble." She said she told McKnight "we were, like, good people. We were just coming together to play darts."

According to Shannon, McKnight kept talking to him and Dejohnette. He testified that he said to McKnight "something along the lines of, 'She's, like, not listening.'" McKnight responded, "Who the fuck is you talking to?" and "Do you want to go outside?" Shannon responded, "Let's go." Shannon later testified, "I wasn't really for sure what he was trying to go outside to do. . . . I was thinking maybe I could, like, calm him down because he seemed angry." McKnight got up from the table and Shannon followed him outside.

Dejohnette went outside too. On her way, she told Durant, "You might want to check on your friend. He seems kind of heated."

McKnight and Shannon were standing "[f]ace to face" around the corner from J.P.'s entrance. Dejohnette said she heard McKnight say he was going to shoot Shannon "in his fucking face." Dejohnette tried to call to Shannon but he

---

[2] The four other friends were Xavier, Boyon, Ben, and Travis. The record is unclear on their last names, and they did not testify at trial.

appeared to ignore her; McKnight also did not acknowledge her presence. She asked Durant if he was friends with McKnight and Durant said that "he was going to handle it." So Dejohnette went back inside. Durant also tried to get McKnight's attention by calling his name repeatedly. He testified that it "sounded like [McKnight] was asking [Shannon] a question."

Shannon testified as follows: He saw McKnight reach "towards his side in, like—kind of like in a police manner to where they, like, get ready to pull their firearm and tell you to freeze." He thought McKnight was an "undercover" or "off-duty police officer." He also thought McKnight had a gun. McKnight said, "Freeze, motherfucker." Shannon put his hands up. He said McKnight "threaten[ed] me and let me know he'd blow my head off and he'd kill me if I moved wrong" and said, "Don't fucking—don't move. I'll shoot you right now." When Durant called McKnight's name, McKnight "finally took his focus off me and I was able to do something about the situation I was in." Shannon then pulled his gun from his waistband and shot McKnight five times.

McKnight testified as follows: While outside, he saw Shannon "motioning" towards or "messing around with. . . his belt." McKnight said that he thought Shannon had a knife. He said, "I froze." He put his "hand out and said, 'Whoa, whoa, whoa. Stop.' Or something like that." Then Shannon started shooting. But McKnight never saw the gun.

McKnight also testified that he had nothing in his hands and he did not reach for anything during the incident. He did not have a firearm, but he did have

3

a folding knife clipped in his right pocket. He said the "metal clip would be exposed."

Durant testified that he saw nothing in McKnight's hands. He said that at first Shannon's hands "were in his pockets." He said that he then saw Shannon "pull out a gun and shoot [McKnight]" and it looked like Shannon shot McKnight "without any thought process. Like, it was second nature."

Shannon also testified as follows: After he shot McKnight, "I proceeded to walk across the street. And as I'm walking across the street, there was people standing in the smoking area. And I pointed at them and said, 'Somebody call the police. This guy just shot to kill me.'" Shannon approached "a stranger" in a parked SUV and said, "He just tried to kill me. I ended up shooting him, and I have to get to my cousin's house. I'll give you some money, but I need to get out of here." The driver responded, "Hop in."

Multiple witnesses saw Shannon walk across the street and get into the SUV. The driver took Shannon to his cousin's house in Federal Way, Washington, and the next day Shannon went to another cousin's house in Portland, Oregon.

Shannon learned there was a warrant for his arrest and that he was mentioned as a fugitive on a television show. He said he tried to save money for adequate legal counsel. He also said that he talked with a few lawyers who advised him not to talk to law enforcement, so he did not make a statement.

The State charged Shannon with assault in the first degree in April, and added a firearm enhancement by amended information in September. Law

enforcement did not locate and take Shannon into custody until December, about 10 months after the incident.

At trial, Shannon claimed self-defense.  A jury found him guilty of assault in the first degree while armed with a firearm.  He appeals.[3]

## II.    ANALYSIS

### A.  Exclusion of "White Boy" Evidence

For the first time on appeal, Shannon says the trial court violated his rights under the Sixth Amendment to the U.S. Constitution and article I, section 22 of the Washington State Constitution to cross-examination and to present a defense when it precluded defense counsel from asking McClinton if McKnight or Durant told him the incident started because someone said to McKnight, "Get out of here white boy."  Shannon contends the "white boy" evidence reflects racial dynamics, which support his self-defense theory.  But the exclusion of that evidence was not prejudicial to Shannon.

### 1.  The Questioning at Issue & the Trial Court's Ruling

On cross-examination, defense counsel asked McClinton, "And you also remember that somebody told you that the whole thing started because somebody said something to the effect of, 'Get out of here white boy[]?'"  The State objected on hearsay grounds, which objection the trial court sustained. Defense counsel responded, "Your Honor, [this] doesn't go to the truth of the matter asserted.  It goes to the mindset of the group of people discussing the issue."  The State then objected that the question raised "facts not in evidence."

---

[3] This opinion discusses additional facts below as necessary.

5

The trial court sustained that objection. Defense counsel asked McClinton if he talked about the incident with McKnight and Durant, and McClinton said, "[O]bviously it came up once, but no one really wanted to talk about it a whole lot." Defense counsel then asked McClinton, "[Y]ou think that either [Durant] or [McKnight] told you that the whole thing started because someone called [McKnight] a white boy; right?" The State objected that the question called for speculation, but the trial court sustained on hearsay grounds.

Later, outside the presence of the jury, defense counsel said,

The purpose of that question is not to elicit hearsay because I don't— I'm not offering it for the truth of the matter asserted. I don't believe that statement was made. But I believe it goes to the state of mind of Mr. McClinton, Mr. Durant, and Mr. McKnight that they discussed that as the reason.

The trial court responded, "Thank you. Your record is complete. I am sustaining the objection." At no time did Shannon object on constitutional grounds.

2. RAP 2.5

Generally, we will not consider issues raised for the first time on appeal. State v. A.M., 194 Wn.2d 33, 38, 448 P.3d 35 (2019). RAP 2.5(a)(3) provides an exception to that rule when the appellant raises a "manifest error affecting a constitutional right." To raise such an error, Shannon must identify a constitutional error and show how the error actually prejudiced his rights at trial. State v. Kirkman, 159 Wn.2d 918, 926–27, 155 P.3d 125 (2007). "It is this showing of actual prejudice that makes the error 'manifest,' allowing appellate review." State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).

6

Shannon contends the trial court violated his Sixth Amendment and article I, section 22 rights to cross-examine and to present a defense.[4] He contends the "white boy" statement was relevant to McKnight, McClinton, and Durant's states of mind, which was relevant to his self-defense theory that he acted because he thought those individuals held "racial animus or discomfort."

"In considering a claim of self-defense, the jury must take into account all of the facts and circumstances known to the *defendant*. . . . such evidence is admissible to show the defendant's reason for fear and the basis for acting in self-defense." State v. Burnam, 4 Wn. App. 2d 368, 361, 421 P.3d 977 (2018) (emphasis added) (citations omitted) (internal quotation marks omitted). While a defendant has a right to cross-examine and present a defense, that right is not absolute: "[A] defendant has no right to present irrelevant evidence." State v. Orn, 197 Wn.2d 343, 352, 482 P.3d 913 (2021). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." ER 401.

Shannon does not show how McKnight, McClinton, and Durant's states of mind were relevant to his self-defense claim. By claiming self-defense, Shannon

---

[4] The State contends the invited error doctrine precludes review of this claim. The doctrine precludes review when the "'defendant affirmatively assented to the error, materially contributed to it, or benefited from it,'" even if that error raises a constitutional issue. In re Pers. Restraint of Salinas, 189 Wn.2d 747, 755, 408 P.3d 344 (2018) (emphasis omitted) (quoting In re Pers. Restraint of Coggin, 182 Wn.2d 115, 119, 340 P.3d 810 (2014)). The State says that the doctrine applies because defense counsel told the trial court that he was not eliciting McClinton's testimony for the truth of the matter asserted and is now arguing that the testimony was admissible for the truth of the matter asserted. To the contrary, consistent with his argument at trial, on appeal, Shannon argues the testimony is admissible under ER 803(a)(2) as evidence of a then existing state of mind. So the invited error doctrine does not apply.

put his own state of mind at issue. And the evidence at issue was not probative as to Shannon's state of mind because no evidence shows that he heard the "white boy" statement. Thus, Shannon does not raise a constitutional error.

Even if Shannon did raise such an error, he does not establish that excluding the "white boy" evidence actually prejudiced his rights at trial. First, the evidence was irrelevant and thus not probative as to his self-defense. And second, the trial court's ruling did not prevent Shannon from eliciting other evidence that could relate to racial dynamics or using evidence of racial dynamics in closing argument. For example, Shannon contends that McKnight's "sinister" comment suggests "potential racial animosity." And during closing argument, defense counsel discussed racial dynamics: "[T]he reality is there are racial dynamics at work in this situation." He said, "A young black man experiences the world differently than a young white man. . . . This case really is about different perspectives. . . . We've got different perspectives from different groups of people, different friend groups, different races, [and] different ages." He said that "when a person [threatening to blow your fucking head off] is a white man and you are a young black man, it might make the threat more realistic to you." Because the evidence was not probative to Shannon's state of mind and the court did not prevent Shannon from eliciting other evidence that could relate to racial dynamics, the alleged constitutional error was not manifest and Shannon cannot raise it for the first time on appeal.

B. Evidence of Prearrest Silence

Also for the first time on appeal, Shannon says the State commented on his prearrest silence in violation of his right against self-incrimination under the Fifth Amendment to the U.S. Constitution and article I, section 9 of the Washington State Constitution.[5]  The State responds that it used Detective Chris Edwards's testimony to explain why the incident occurred in February but law enforcement did not arrest Shannon until December.  As discussed below, the State did not comment on Shannon's silence in violation of his right against self-incrimination.

---

[5] As for the Fifth Amendment, Shannon acknowledges that in State v. Magana, 197 Wn. App. 189, 194–95, 389 P.3d 654 (2016), abrogated on other grounds by State v. Johnson, 4 Wn. App. 2d 352, 421 P.3d 969 (2018), Division Three of this court recognized that under Salinas v. Texas, 570 U.S. 178, 133 S. Ct. 2174, 186 L. Ed. 2d 376 (2013), absent an express invocation of the right to silence, prearrest silence is admissible as evidence of guilt.  He says that, to the extent that Division Three is correct, we should conclude that article I, section 9 is more protective with respect to prearrest silence than the Fifth Amendment by applying State v. Gunwall, 106 Wn.2d 54, 720 P.2d 808 (1986) (providing six nonexclusive factors to determine whether the Washington State Constitution and the United States Constitution provide different protections for rights protected under both constitutions).  Because we conclude that the State did not comment on Shannon's prearrest silence, we need not conduct a Gunwall analysis. State v. Parks, No. 78036-1-I, slip op. at 9 (Wash. Ct. App. Jul. 20, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/780361.pdf ("Because we conclude that the State did not improperly comment on Parks' prearrest silence, we need not conduct a Gunwall analysis."); see GR 14.1(c) ("Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions.").  Notably, in Magana, without conducting a Gunwall analysis, Division Three wrote, "Legally, this is not an area where our State's constitution affords greater protection that the federal constitution."  197 Wn. App. at 194–95; see also State v. Alvarez, No. 35567-5-III, slip op. at 3 (Wash. Ct. App. Jan. 23, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/355675_ord.pdf, review denied, 195 Wn.2d 1021, 464 P.3d 200 (2020) ("In balancing the Gunwall factors, we conclude that Washington Constitution article I, section 9 does not provide greater protections in this area than the Fifth Amendment to the United States Constitution."); GR 14.1(c).

1.  The Testimony at Issue

Edwards investigated this case. He testified as follows: The day after the incident, he identified Shannon as a suspect. On February 8, Edwards tried to contact Shannon. He said, "I wanted to be able to talk to Mr. Shannon to get his side of the story so that I could paint a clear picture for the prosecutor's office." He tried to contact Shannon through his family, his friends, and his landlord. Edwards left Shannon many voice messages and Facebook messages. Shannon did not respond. On February 11, Edwards learned that Shannon might be in Portland and contacted law enforcement there for help finding him. On February 14, Edwards obtained another phone number for Shannon and tried to contact him again. Shannon did not return Edwards's call. At trial, Shannon did not object to any of this testimony on constitutional grounds.

In addition to evidence about Edward's investigation, the State introduced evidence that Shannon fled the scene. Durant, McClinton, and a bartender at J.P.'s testified that they saw Shannon walk across the street and get into an SUV. After the State rested, Shannon testified that after he shot McKnight, he left the scene because he was "[s]till terrified." He later learned there was a warrant for his arrest and he did not turn himself in. Law enforcement eventually located Shannon and took him into custody.

During closing argument, defense counsel said:

> I think it's been more and more clear that the biggest mistake Steven Shannon made that night was leaving the scene. You've heard that he regrets shooting Ian McKnight, and he agrees that he wishes he hadn't done it.

10

I think you can also understand why, if he had stayed at the scene and explained what happened to the police that night, that we might not be here now.

2. RAP 2.5

Shannon says the State violated his right against self-incrimination when it elicited testimony that Edwards: (1) left many messages for Shannon that went unanswered and (2) wanted Shannon's statement before forwarding the case to the prosecuting attorney. For Shannon to raise this issue for the first time on appeal, he must establish a manifest constitutional error under RAP 2.5(a)(3). He does not do so.

Shannon contends the trial court violated his Fifth Amendment and article I, section 9 right against self-incrimination. But Shannon does not raise a constitutional error.

The Fifth Amendment and article I, section 9 protect criminal defendants' right to silence. State v. Pinson, 183 Wn. App. 411, 417, 333 P.3d 528 (2014). A defendant has a pre- and post-arrest right to remain silent. Id. But to rely on that privilege, the defendant must invoke the right to silence. Id. at 418. The two exceptions to this requirement—that a defendant need not take the witness stand to invoke the right and that a defendant subject to custodial interrogation or government coercion need not invoke the right—do not apply here. See id. "[T]he State may not elicit comments from witnesses or make closing arguments relating to a defendant's silence to infer guilt from such silence." State v. Easter, 130 Wn.2d 228, 236, 922 P.2d 1285 (1996). No evidence suggests that Shannon received any of Edwards's messages or that Shannon knew that

Edwards tried to reach him. Because Edwards did not testify that Shannon was silent in response to a law enforcement inquiry, Shannon's nonresponse is not the type that the Fifth Amendment and article I, section 9 protect.

Given the foregoing, Shannon does not raise a constitutional issue reviewable for the first time on appeal.[6]

3. Ineffective Assistance of Counsel

Shannon says that his defense counsel was ineffective for failing to object to Edwards's testimony on his unresponsiveness.[7] The Sixth Amendment and article I, section 22 guarantee the right to effective assistance of counsel. We review ineffective assistance of counsel claims de novo. State v. Estes, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To establish ineffective assistance of counsel,

> [A] defendant must make two showings: (1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different.

McFarland, 127 Wn.2d at 334–35. "There is a strong presumption that counsel's performance was reasonable." State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177

---

[6] Shannon also says the State violated his right against self-incrimination during opening statements when it stated he fled for 10 months. The prosecutor said, "Now, after the shooting, Steven Shannon fled. And he wasn't located until months later in December of 2018 when he was arrested." The prosecutor did not, however, comment on Shannon's nonresponse to law enforcement. Thus, Shannon does not raise a constitutional issue.

[7] Shannon does not appear to claim that defense counsel was ineffective for failing to object to the State's comments in its opening statement.

(2009). Because Edwards's testimony was not a comment on Shannon's silence, Shannon's counsel was not deficient by failing to object.

C. Prosecutorial Misconduct

Shannon says a prosecutor engaged in misconduct by communicating with the jury while Shannon was testifying and during defense counsel's closing argument, and that this denied him a fair trial under the Sixth and Fourteenth Amendments to the U.S. Constitution and article I, section 22 of the Washington State Constitution. But Shannon does not show a substantial likelihood that any such misconduct affected the jury verdict.

Prosecutorial misconduct may deprive a defendant of their constitutional right to a fair trial under the Sixth and Fourteenth Amendments and article I, section 22. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703–04, 286 P.3d 673 (2012). To prevail on a claim of prosecutorial misconduct, a defendant must "show that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." Id. at 704. To show prejudice, the defendant must show "a substantial likelihood that the misconduct affected the jury verdict." Id. We review allegations of prosecutorial misconduct for abuse of discretion. State v. Wang, 5 Wn. App. 2d 12, 30, 424 P.3d 1251 (2018).

A court reporter transcribed the trial testimony from an audio recording. While this appeal was pending, Shannon's appellate counsel discovered that the transcript included multiple statements that one of the prosecutors made during

Shannon's testimony and defense counsel's closing argument.[8]  The court held a fact-finding hearing on the matter.

During the hearing, the prosecutor testified, "It's my understanding that some comments that I made while at counsel table got picked up by the FTR and were transcribed into the actual transcript."  The trial court said, "[I]f there were side conversations while argument was being made to the jury, no comment was objected to, or there was no indication that such comment or the substance of the comments were heard by anybody in the courtroom."  Apparently, the microphone at the prosecutor's table recorded but did not amplify his statements.

---

[8] The prosecutor's first comment listed below occurred during the defense's direct examination of Shannon and his next six comments occurred during defense counsel's closing argument.  The comments include the following:

(1) Defense counsel asked Shannon, "Why didn't you just stay and talk to the police?"  While Shannon was responding, the prosecutor said, "I am going to ask him that."

(2) Defense counsel said, "The State of Washington has charged Steven Shannon with assault in the first degree for shooting [McKnight].  And now they stand here and tell you that they've proven to you beyond any reasonable doubt that Steven Shannon was acting in self-defense."  The prosecutor said, "Wasn't."

(3) Defense counsel said, "Nobody remembers getting to the bar.  Well, there's Ian in his good old boy sweatshirt holding the door," and the prosecutor said, "Good old boy sweatshirt.  Wow."

(4) Defense counsel said, "You know that Mr. McKnight had something black and silver in his hands as he was threatening to shoot Mr. Shannon," and the prosecutor said, "What?"

(5) Defense counsel said that when Durant and Dejohnette were watching McKnight and Shannon's interaction, "[Dejohnette] said to [Durant], you need to break this up.  That's what he remembers.  He remembers her saying something to the effect of, 'Your friend's getting heated,' or, 'Is that your friend?'"  The prosecutor said, "He needs to shut up."

(6) Defense counsel said that the "State said [Shannon] shot first and asked questions later," and the prosecutor said, "I did not say that."

(7) When defense counsel concluded his closing argument, the prosecutor said, "That's it?"

14

After the hearing, the court made four findings of fact:

1. The whispered comments by Mr. Soukup[, the prosecutor,] captured on the FTR recording during defense counsel's direct examination of the defendant and defense counsel's closing were not audible to the Court at the time.

2. Mr. Carter-Eldred, [defense counsel,] as noted in his declaration, perceived that Mr. Soukup was saying something at times during Mr. Carter-Eldred's closing argument but could not hear what he was saying.

3. The Court did not see anyone react or otherwise indicate that they heard the comments.

4. The Court finds that Mr. Soukup's testimony and Mr. Shannon's testimony were credible and made to the best of their respective recollections.

Because no indication exists that the jury heard the comments, Shannon cannot show "a substantial likelihood that the misconduct affected the jury verdict" and thus cannot show how any misconduct prejudiced him.

Shannon relies on Remmer v. United States, 347 U.S. 227, 74 S. Ct. 450, 98 L. Ed. 654 (1954), to say the prosecutor's statements were presumptively prejudicial and the State cannot show the prejudicial misconduct was harmless. In Remmer, the U.S. Supreme Court wrote,

> In a criminal case, *any private communication, contact, or tampering directly or indirectly, with a juror* during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Id. at 229 (emphasis added). Here, because Shannon does not show that any juror heard the prosecutor's statements, he fails to show that those statements prejudiced him.

15

D. Cumulative Error

Shannon says the cumulative effect of the alleged errors denied him a fair trial. The cumulative error doctrine applies in limited "instances when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). As discussed above, certain of the claimed errors—violation of Shannon's rights to cross-examination, to present a defense, and to silence—are not reviewable for the first time on appeal. Also, because Edwards's testimony did not violate Shannon's right against self-incrimination, defense counsel was not ineffective for failing to object to the testimony. And any prosecutorial misconduct was not prejudicial. Given the foregoing, the cumulative error doctrine does not apply.

We affirm.

_____
Chun, J.

WE CONCUR:

_____          _____
Verellen, J.                                      Appelwick, J.

16